# FEDERAL EMPLOYEES

# HEALTH BENEFITS PROGRAM

## *STANDARD CONTRACT*

## *FOR*

## *FEE-FOR-SERVICE CARRIERS*

## 2008

## CONTRACT FOR FEDERAL EMPLOYEES HEALTH BENEFITS

CONTRACT NO: CS 1039      FULL CONTRACT
EFFECTIVE:    January 1, 1960      EFFECTIVE: January 1, 2008

BETWEEN:    The United States Office of Personnel Management
       *hereinafter called OPM, the Agency, or the Government*

       Address:        1900 E Street, NW
                        Washington, DC 20415-3610

AND

CONTRACTOR:    Blue Cross and Blue Shield Association
       *hereinafter also called the Carrier*

       Address:        1310 G Street, NW., Suite 900
                        Washington, DC 20005

In consideration of payment by the Agency of subscription charges set forth in Appendix B, the Carrier agrees to perform all of the services set forth in this contract, including Appendix A.

FOR THE CARRIER           FOR THE GOVERNMENT

Stephen W. Gammarino           Shirley R. Patterson
Name of Person Authorized to           Name of Contracting Officer (Type or Print)
Execute Contract (Type or Print)
Sr. Vice Pres. Nat. Programs           Chief, Health Insurance Group, I, Insurance
                                       Services Programs
Title                                     Title

Signature                                 Signature

12/21/07                                 12/31/07
Date Signed                               Date Signed

# TABLE OF CONTENTS

This is an experience-rated contract for the fee-for-service plan Carrier and consists of the cover page, the table of contents and the provisions, clauses and appendices as included in PARTS 1 through 6.

## PART I - GENERAL PROVISIONS

1.1    DEFINITIONS OF FEHB TERMS
1.2    ENTIRE CONTRACT
1.3    ORDER OF PRECEDENCE
1.4    INCORPORATION OF LAWS AND REGULATIONS
1.5    RECORDS AND INFORMATION TO BE FURNISHED BY OPM
1.6    CONFIDENTIALITY OF RECORDS (FEHBAR)
1.7    STATISTICS AND SPECIAL STUDIES
1.8    NOTICE
1.9    PLAN PERFORMANCE—EXPERIENCE-RATED FFS CONTRACTS
1.10   NOTICE OF SIGNIFICANT EVENTS (FEHBAR)
1.11   FEHB INSPECTION (FEHBAR)
1.12   CORRECTION OF DEFICIENCIES
1.13   INFORMATION AND MARKETING MATERIALS
1.14   MISLEADING, DECEPTIVE OR UNFAIR ADVERTISING (FEHBAR)
1.15   RENEWAL AND WITHDRAWAL OF APPROVAL (FEHBAR)
1.16   SUBCONTRACTS (FEHBAR)
1.17   NOVATION AGREEMENT (FEHBAR)
1.18   AGREEMENT TO RECOGNIZE CARRIER'S CHANGE OF NAME (FEHBAR)
1.19   UNDERWRITER
1.20   CERTIFICATION UNDER P.L. 104-191   (HEALTH INSURANCE PORTABILITY
       AND ACCOUNTABILITY ACT OF 1996)
1.21   PATIENTS' BILL OF RIGHTS
1.22   ADMINISTRATIVE SIMPLIFICATION - HIPAA
1.23   HIPAA COMPLIANCE
1.24   NOTICE ON TERMINATION OF FEHBP OR PROVIDER CONTRACT
1.25   TRANSITIONAL CARE
1.26   STANDARDS FOR PHARMACY BENEFITS MANAGEMENT COMPANY (PBM)
       ARRANGEMENTS
1.27   DISCLOSURE NOTICE UNDER P.L. 108-173
       (MEDICARE MODERNIZATION ACT OF 2003)
1.28   CARRIER DISASTER RECOVERY PLAN
1.29   HEALTH INFORMATION TECHNOLOGY REQUIREMENTS

## PART II - BENEFITS

2.1    ENROLLMENT ELIGIBILITY AND EVIDENCE OF ENROLLMENT
2.2    BENEFITS PROVIDED

2.3   PAYMENT OF BENEFITS AND PROVISION OF SERVICES AND SUPPLIES
2.4   TERMINATION OF COVERAGE AND CONVERSION PRIVILEGES
2.5   SUBROGATION
2.6   COORDINATION OF BENEFITS (FEHBAR)
2.7   DEBARMENT AND OTHER SANCTIONS
2.8   FILING HEALTH BENEFIT CLAIMS/COURT REVIEW OF DISPUTED CLAIMS
2.9   CLAIMS PROCESSING
2.10  CALCULATION OF COST SHARING PROVISIONS
2.11  BENEFITS PAYMENTS WHEN MEDICARE IS PRIMARY
2.12  CONTINUING REQUIREMENTS AFTER TERMINATION OF THE CARRIER
2.13  LARGE PROVIDER AGREEMENTS (FEHBAR)
2.14  COORDINATION OF PRESCRIPTION DRUG BENEFITS WITH MEDICARE

## PART III - PAYMENTS, CHARGES AND ACCOUNTING

3.1   PAYMENTS—EXPERIENCE-RATED CONTRACTS (FEHBAR)
3.2   ACCOUNTING AND ALLOWABLE COST (FEHBAR)
3.3   SPECIAL RESERVE
3.4   INVESTMENT INCOME (FEHBAR)
3.5   NON-COMMINGLING OF FUNDS (FEHBAR)
3.6   UNCASHED CHECKS
3.7   SERVICE CHARGE
3.8   CONTRACTOR RECORDS RETENTION (FEHBAR)
3.9   APPROVAL FOR ASSIGNMENT OF CLAIMS (FEHBAR)
3.10  AUDIT, FINANCIAL, AND OTHER INFORMATION
3.11  SURVEY CHARGES
3.12  FEHB CLEARINGHOUSE
3.13  TAXPAYER IDENTIFICATION NUMBER (FEHBAR)

## PART IV - SPECIAL PROVISIONS

4.1   ALTERATIONS IN CONTRACT (FAR)

## PART V - STANDARD CLAUSES

This contract shall include all of the following standard clauses required by the Federal Acquisition Regulation (FAR) or Federal Employees Health Benefits Acquisition Regulation (FEHBAR).

5.1   DEFINITIONS
5.2   [RESERVED]
5.3   GRATUITIES
5.4   COVENANT AGAINST CONTINGENT FEES
5.5   ANTI-KICKBACK PROCEDURES
5.6   [RESERVED]
5.7   AUDIT AND RECORDS-NEGOTIATION

(FFS-2008)

5.8    PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA
5.9    [RESERVED]
5.10  SUBCONTRACTOR COST OR PRICING DATA
5.11  [RESERVED]
5.12  [RESERVED]
5.13  [RESERVED]
5.14  UTILIZATION OF SMALL BUSINESS CONCERNS
5.15  [RESERVED]
5.16  [RESERVED]
5.17  CONVICT LABOR
5.18  CONTRACT WORK HOURS AND SAFETY STANDARDS ACT-OVERTIME COMPENSATION
5.19  EQUAL OPPORTUNITY
5.20  [RESERVED]
5.21  NOTIFICATION OF VISA DENIAL
5.22  EQUAL OPPORTUNITY FOR SPECIAL DISABLED VETERANS, VETERANS OF THE VIETNAM ERA, AND OTHER ELIGIBLE VETERANS
5.23  AFFIRMATIVE ACTION FOR WORKERS WITH DISABILITIES
5.24  [RESERVED]
5.25  DRUG FREE WORKPLACE
5.26  [RESERVED]
5.27  FEDERAL, STATE, AND LOCAL TAXES (STATE AND LOCAL ADJUSTMENTS)
5.28  [RESERVED]
5.29  TAXES--FOREIGN NEGOTIATED BENEFITS CONTRACTS
5.30  [RESERVED]
5.31  [RESERVED]
5.32  [RESERVED]
5.33  DISCOUNTS FOR PROMPT PAYMENT
5.34  INTEREST (FEHBAR MODIFICATION OF FAR)
5.35  ASSIGNMENT OF CLAIMS
5.36  DISPUTES
5.37  NOTICE OF INTENT TO DISALLOW COSTS
5.38  CHANGES--NEGOTIATED BENEFITS CONTRACTS
5.39  COMPETITION IN SUBCONTRACTING
5.40  GOVERNMENT PROPERTY (NEGOTIATED BENEFITS CONTRACTS)
5.41  LIMITATION OF LIABILITY--SERVICES
5.42  PREFERENCE FOR U.S. FLAG AIR CARRIERS
5.43  GOVERNMENT SUPPLY SOURCES
5.44  AUTHORIZED DEVIATIONS IN CLAUSES
5.45  LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS
5.46  [RESERVED]
5.47  PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED OR PROPOSED FOR DEBARMENT
5.48  BANKRUPTCY

5.49  FEHBP TERMINATION FOR CONVENIENCE OF THE GOVERNMENT--
      NEGOTIATED BENEFITS CONTRACTS
5.50  FEHBP TERMINATION FOR DEFAULT-- NEGOTIATED BENEFITS CONTRACTS
5.51  PENSION ADJUSTMENTS AND ASSET REVERSIONS
5.52  REVERSION OR ADJUSTMENT OF PLANS FOR POSTRETIREMENT BENEFITS
      (PRB) OTHER THAN PENSIONS
5.53  NOTICE TO THE GOVERNMENT OF LABOR DISPUTES
5.54  PENALTIES FOR UNALLOWABLE COSTS
5.55  EMPLOYMENT REPORTS ON SPECIAL DISABLED VETERANS, VETERANS OF
      THE VIETNAM ERA, AND OTHER ELIGIBLE VETERANS
5.56  AUTHORIZATION AND CONSENT
5.57  NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT
      INFRINGEMENT
5.58  PAYMENT BY ELECTRONIC FUNDS TRANSFER—CENTRAL CONTRACTOR
      REGISTRATION
5.59  PROHIBITION OF SEGREGATED FACILITIES
5.60  SUBCONTRACTS FOR COMMERCIAL ITEMS
5.61  NOTIFICATION OF EMPLOYEE RIGHTS CONCERNING PAYMENT OF UNION
      DUES OR FEES
5.62  APPLICABLE LAW FOR BREACH OF CONTRACT CLAIM

PART VI -- APPENDICES

A-  FEHBP BROCHURE
B-  SUBSCRIPTION RATES, CHARGES AND LIMITATIONS
C-  FEHBP SUPPLEMENTAL LITERATURE GUIDELINES JANUARY 2000
D-  RULES FOR COORDINATION OF BENEFITS, MODEL REGULATION SERVICE,
    JANUARY 1996, NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS
E-  SMALL BUSINESS SUBCONTRACTING PLAN

# PART I - GENERAL PROVISIONS

## SECTION 1.1
## DEFINITIONS OF FEHB TERMS (JAN 1998)

For purpose of this contract, the following definitions apply:

| | |
|---|---|
| FEHBP: | Federal Employees Health Benefits Program. |
| Enrollee: | The Federal employee, annuitant, former spouse, temporarily-covered former Federal employee or dependent, enrolled under this contract. |
| Member: | The Enrollee and/or an eligible dependent for benefit purposes, and sometimes referred to as subscriber. |
| Act: | The Federal Employees Health Benefits Act, as amended; chapter 89 of title 5, United States Code. |
| Regulations: | (1) The Federal Employees Health Benefits Regulations; part 890, title 5, Code of Federal Regulations, and (2) Chapters 1 and 16 of title 48, Code of Federal Regulations. |
| Benefits: | Covered services or payment for covered services set forth in Appendix A, to which Members are entitled to the extent provided by this contract. |
| Carrier: | As defined by chapter 89 of title 5, United States Code, and may be used interchangeably with the term Contractor. |
| Subcontractor: | Any supplier, distributor, vendor, or firm that furnishes supplies or services to or for a prime contractor, or another subcontractor, except for providers of direct medical services or supplies pursuant to the Carrier's health benefits plan. |
| Letter of Credit: | The method by which certain Carriers, and their underwriters if authorized, receive recurring premium payments and contingency reserve payments by drawing against a commitment (certified by a responsible OPM official) which specifies a dollar amount available. For each Carrier participating in the Letter of Credit arrangement for payment under FEHBAR 1632.170(b), the terms "carrier reserves" and "special reserves" include any balance in the Carrier's Letter of Credit account. |

## SECTION 1.2
## ENTIRE CONTRACT (JAN 2003)

(a) This document as described in the *Table of Contents* constitutes the entire contract between the parties. No oral statement of any person shall modify or otherwise affect the terms, conditions, or specifications stated in this contract. All modifications to the contract must be made in writing by the duly authorized Contracting Officer.

(b) All statements concerning coverage or benefits made by OPM, the Carrier or by any individual covered under this contract shall be deemed representations and not warranties. No such statement shall convey or void any coverage, increase or reduce any benefits under this contract or be used in the prosecution of or defense of a claim under this contract unless it is contained in writing and a copy of the instrument containing the statement is or has been furnished to the Member or to the person making the claim.

## SECTION 1.3

(FFS-2008)

ORDER OF PRECEDENCE (JAN 1996)

Any inconsistency in this contract shall be resolved by giving precedence in the following descending order: The Act, the regulations in part 890, title 5, Code of Federal Regulations, the regulations in chapters 1 and 16, title 48, Code of Federal Regulations, and this contract.

SECTION 1.4
INCORPORATION OF LAWS AND REGULATIONS (JAN 2002)

(a) The applicable provisions of (1) chapter 89 of title 5, United States Code; (2) OPM's regulations as contained in part 890 of title 5, Code of Federal Regulations; and (3) chapters 1 and 16 of title 48, Code of Federal Regulations constitute a part of this contract as if fully set forth herein, and the other provisions of this contract shall be construed so as to comply therewith.

(b) If the Regulations are changed in a manner which would increase the Carrier's liability under this contract, the Contracting Officer will make an equitable adjustment in accordance with the changes clause, Section 5.38 -- Changes--Negotiated Benefits Contracts.

SECTION 1.5
RECORDS AND INFORMATION TO BE FURNISHED BY OPM (NOV 2000)

(a) OPM shall maintain or cause to be maintained records from which the Carrier may determine the names and social security numbers of all Enrollees. OPM, other agencies of the Federal Government, or the FEHB Clearinghouse shall furnish the information to the Carrier at such times and in such form and detail as will enable the Carrier to maintain a currently accurate record of all Enrollees.

(b) The Carrier is entitled to rely on information furnished to it under paragraph (a). OPM agrees that any liabilities incurred under this contract in reliance upon such information shall be a valid charge against the contract. Errors or delays in keeping or reporting data relating to coverage shall not invalidate coverage that would otherwise be validly in force and shall not continue coverage that would otherwise be terminated. OPM shall make an equitable adjustment of premiums upon discovery of errors or delays under this Section.

(c) Clerical error (whether by OPM, any other Government agency, the FEHB Clearinghouse, or the Carrier) in keeping records pertaining to coverage under this contract, delays in making entries thereon, or failure to make or account for any deduction of enrollment charges, shall not invalidate coverage otherwise validly in force or continue coverage otherwise validly terminated. OPM shall make an equitable adjustment of premiums when an error, delay, or failure is discovered. If any person finds relevant facts pertaining to a person covered under this contract to be misstated, and if the misstatement affects the existence, amount, or extent of coverage, the actual facts shall determine whether coverage is in force under the terms of this contract and in what amount or to what extent. Any claim payments the Carrier makes before an adjustment or determination shall be a valid charge against this contract.

(d) The OPM shall direct the agencies to provide the Carrier or the FEHB Clearinghouse, not less often than quarterly, the names of Enrollees enrolled under the contract by payroll office and the premium paid for those Enrollees for the current pay cycle. The Carrier shall at least

quarterly reconcile its enrollment records with those provided by the Government or the FEHB Clearinghouse.

## SECTION 1.6
## CONFIDENTIALITY OF RECORDS
(JAN 1991) (FEHBAR 1652.224-70)

(a) The Carrier shall use the personal data on employees and annuitants that is provided by agencies and OPM, including social security numbers, for only those routine uses stipulated for the data and published annually in the Federal Register as part of OPM's notice of systems of records.

(b) The Carrier shall also hold all medical records, and information relating thereto, of Federal subscribers confidential except as follows:

(1) As may be reasonably necessary for the administration of this contract;

(2) As authorized by the patient or his or her guardian;

(3) As disclosure is necessary to permit Government officials having authority to investigate and prosecute alleged civil or criminal actions;

(4) As necessary to audit the contract;

(5) As necessary to carry out the coordination of benefit provisions of this contract; and

(6) For bona fide medical research or educational purposes. Release of information for medical research or educational purposes shall be limited to aggregated information of a statistical nature that does not identify any individual by name, social security number, or any other identifier unique to an individual.

(c) If the Carrier uses medical records for the administration of the contract, or for bona fide research or educational purposes, it shall so state in the Plan's brochure.

## SECTION 1.7
## STATISTICS AND SPECIAL STUDIES (JAN 2003)

(a) The Carrier shall maintain or cause to be maintained statistical records of its operations under the contract and shall furnish OPM, in the form prescribed by the Contracting Officer, the statistical reports reasonably necessary for the OPM to carry out its functions under Chapter 89 of title 5, United States Code.

(b) The Carrier shall furnish such other reasonable statistical data and reports of special studies as the Contracting Officer may from time to time request for the purpose of carrying out its functions under Chapter 89 of title 5, United States Code.

(c) The Carrier shall furnish the routine reports in the required number of copies as instructed by OPM.

(d) The Carrier shall notify the OPM Contract Representative immediately upon a change in the name or address of the Carrier's contract administrator(s).

## SECTION 1.8
## NOTICE (JAN 2003)

Where the contract requires that notice be given to the other party, such notice must be given in writing to the address shown on this contract's signature page. To notify OPM, the Carrier must write to the Contracting Officer, unless otherwise specified.

SECTION 1.9
PLAN PERFORMANCE--EXPERIENCE-RATED FFS CONTRACTS (JAN 2007)

(a) <u>Detection of Fraud and Abuse.</u> The Carrier shall conduct a program to assess its vulnerability to fraud and abuse and shall operate a system designed to detect and eliminate fraud and abuse internally by Carrier employees and subcontractors, by providers providing goods or services to FEHB Members, and by individual FEHB Members. The program must specify provisions in place for cost avoidance not just fraud detection, along with criteria for follow-up actions. The Carrier must submit to OPM an annual analysis of the costs and benefits of its fraud and abuse program. The Carrier must also submit annual reports to OPM by March 31 addressing the following: number of cases; dollars identified as lost and recovered; actual and projected savings; cases referred by law enforcement and resolved through negotiated settlement; and number of arrests and criminal convictions. The report will also include the industry standards checklist.

(b) <u>Clinical Care Measures.</u> The Carrier shall measure and/or collect data on the quality of the health care services that are provided to its members as requested by OPM. Measurement/data collection efforts may include performance measurement systems such as Health Employer Data and Information Set (HEDIS) or similar measures developed by accrediting organizations such as the National Committee for Quality Assurance (NCQA), the Joint Commission on Accreditation of Healthcare Organizations (JCAHO), or URAC. Costs incurred by the Carrier for collecting or contracting with a vendor to collect quality measures/data shall be the Carrier's responsibility and are allowable administrative expenses, subject to the administrative cost limitation.

(c) <u>Patient Safety.</u> The Carrier shall implement a patient safety improvement program. At a minimum, the Carrier shall --

(1) Report to OPM on its current patient safety initiatives;

(2) Report to OPM on how it will strengthen its patient safety program for the future;

(3) Assist OPM in providing its members with consumer information and education regarding patient safety; and

(4) Work with its providers, independent accrediting organizations, and others to implement patient safety improvement programs.

(d) <u>Accreditation.</u> To demonstrate its commitment to providing quality, cost-effective health care, the Carrier shall continue to pursue and maintain accreditation according to the steps and timeframes outlined in the carrier's current business plan. The carrier shall submit accreditation changes and business plan updates to its OPM contract representative.

(e) <u>Consumer Assessments of Healthcare Providers and Systems (CAHPS).</u> In addition to any other means of surveying Plan members that the Carrier may develop, the Carrier shall participate in the HEDIS Consumer Assessments of Healthcare Providers and Systems (CAHPS) to provide feedback to enrollees on enrollee experience with the various FEHBP plans. The Carrier shall take into account the published results of the survey, or other results as directed by OPM, in identifying areas for improvement as part of the Carrier's

quality assurance program. Payment of survey charges will be in accordance with Section 3.11.

(f) <u>Contract Quality Assurance</u>. The Carrier shall develop and apply a quality assurance program specifying procedures for assuring contract quality. At a minimum the carrier shall meet the following standards and submit an annual report to OPM on these standards by July 1 of the following contract period:

(1) *Claims Processing Accuracy* - the number of FEHB claims processed accurately and the total number of FEHB claims processed for the given time period, expressed as a percentage.

REQUIRED STANDARD: An average of 95 percent of FEHB claims must be processed accurately.

(2) *Claims Coding Accuracy* - the number of FEHB claims coded accurately divided by the total number of FEHB claims coded for the given time period, expressed as a percentage.

REQUIRED STANDARD: An average of 98 percent of FEHB claims shall be coded accurately.

(3) *Recovery of Erroneous Payments* - the average number of working days it takes for the Carrier to begin collection action against an FEHB provider or member following identification of an erroneous payment, including overpayments.

REQUIRED STANDARD: The Carrier takes an average of no more than 30 working days from the date it identifies an FEHB erroneous payment to the date it begins the collection action.

(4) *Coordination of Benefits (COB)* - the Carrier must demonstrate that a statistically valid sampling technique is routinely used to identify FEHB claims prior to or after processing that require(d) coordination of benefits (COB) with a third party payer. As an alternative, the Carrier may provide evidence that it pursues all claims for COB.

(5) *Claims Timeliness* - the average number of working days from the date the Carrier receives an FEHB claim to the date it adjudicates it (paid, denied or a request for further information is sent out), for the given time period, expressed as a cumulative percentage.

REQUIRED STANDARD: The Carrier adjudicates 95 percent of claims within 30 working days.

(6) *Processing ID cards on change of plan or option* - the number of calendar days from the date the Carrier receives the enrollment from the enrollee's agency or retirement system to the date it issues the ID card.

REQUIRED STANDARD: The Carrier issues the ID card within fifteen calendar days after receiving the enrollment from the enrollee's agency or retirement system except that the Carrier will issue ID cards resulting from an open season election within fifteen calendar days or by December 15, whichever is later.

(7) *Member Inquiries* - the number of working days taken to respond to an FEHB member's written inquiry, expressed as a cumulative percentage, for the given time period.

REQUIRED STANDARD: The Carrier responds to 90 percent of inquiries within 15 working days (including internet inquiries).

(8) *Telephone Access* - the Carrier shall report on the following statistics concerning telephone access to the member services department (or its equivalent) for the given time period. Except that, if the Carrier does not have a computerized phone system, report results of periodic surveys on telephone access.

*(i) Call Answer Timeliness* - the average number of seconds elapsing before the Carrier connects a member's telephone call to its service representative.

REQUIRED STANDARD: On average, no more than 30 seconds elapse before the Carrier connects a member's telephone call to its service representative.

*(ii) Telephone Blockage Rate* - the percentage of time that callers receive a busy signal when calling the Carrier.

REQUIRED STANDARD: No more than 5% of callers receive a busy signal.

*(iii) Telephone Abandonment Rate* - the number of calls attempted but not completed (presumably because callers tired of waiting to be connected to a Carrier representative) divided by the total number of calls attempted (both completed and not completed), expressed as a percentage.

REQUIRED STANDARD: On average, enrollees abandon the effort no more than 5 percent of the time.

*(iv) Initial Call Resolution* – the percentage of issues resolved during the initial call.

REQUIRED STANDARD: On average, caller's issues must be resolved during the initial call at least 60% of the time.

(9) *Responsiveness to FEHB Member Requests for Reconsideration*:

REQUIRED STANDARD: For 100 percent of written FEHB disputed claim requests received for the given time period, within 30 days after receipt by the Carrier, the Carrier shall affirm the denial in writing to the FEHB member, pay the claim, provide the service, or request additional information reasonably necessary to make a determination.

(g) <u>Quality Assurance Plan</u>. The Carrier must demonstrate that a statistically valid sampling technique is routinely used prior to or after processing to randomly sample FEHB claims against Carrier quality assurance/fraud and abuse prevention standards.

(h) <u>Reporting Compliance.</u> The Carrier shall keep complete records of its quality assurance procedures and fraud prevention program and the results of their implementation and make them available to the Government as determined by OPM.

(i) <u>Correction of Deficiencies.</u> The Contracting Officer may order the correction of a deficiency in the Carrier's quality assurance program or fraud prevention program. The Carrier shall take the necessary action promptly to implement the Contracting Officer's order. If the Contracting Officer orders a modification of the Carrier's quality assurance program or fraud prevention program pursuant to this paragraph (i) after the contract year has begun, the costs incurred to correct the deficiency may be excluded from the administrative expenses -- for the contract year -- that are subject to the administrative expenses limitation specified at Appendix B; provided the Carrier demonstrates that the correction of the deficiency significantly increases the Carrier's liability under this contract.

(j) In order to allow sufficient implementation time, the Contracting Officer will notify the Carrier reasonably in advance of any new requirement(s) under paragraphs (a) through (i).

SECTION 1.10
NOTICE OF SIGNIFICANT EVENTS (JUL 2005) (FEHBAR 1652.222-70)

(a) The Carrier agrees to notify the Contracting Officer of any Significant Event within ten (10) working days after the Carrier becomes aware of it. As used in this section, a Significant Event is any occurrence or anticipated occurrence that might reasonably be expected

to have a material effect upon the Carrier's ability to meet its obligations under this contract, including, but not limited to, any of the following:

(1) Disposal of major assets;

(2) Loss of 15% or more of the Carrier's overall membership;

(3) Termination or modification of any contract or subcontract if such termination or modification might have a material effect on the Carrier's obligations under this contract;

(4) Addition or termination of provider agreements;

(5) Any changes in underwriters, reinsurers or participating plans;

(6) The imposition of, or notice of the intent to impose, a receivership, conservatorship, or special regulatory monitoring;

(7) The withdrawal of, or notice of intent to withdraw State licensing, HHS qualification, or any other status under Federal or State law;

(8) Default on a loan or other financial obligation;

(9) Any actual or potential labor dispute that delays or threatens to delay timely performance or substantially impairs the functioning of the Carrier's facilities or facilities used by the Carrier in the performance of the contract;

(10) Any change in its charter, constitution, or by-laws which affects any provision of this contract or the Carrier's participation in the Federal Employees Health Benefits Program;

(11) Any significant changes in policies and procedures or interpretations of the contract or brochure which would affect the benefits available under the contract or the costs charged to the contract;

(12) Any fraud, embezzlement or misappropriation of FEHB funds; or

(13) Any written exceptions, reservations or qualifications expressed by the independent accounting firm (which ascribes to the standards of the American Institute of Certified Public Accountants) contracted with by the Carrier to provide an opinion on its annual financial statements.

(b) Upon learning of a Significant Event OPM may institute action, in proportion to the seriousness of the event, to protect the interest of Members, including, but not limited to--

(1) Directing the Carrier to take corrective action;

(2) Suspending new enrollments under this contract;

(3) Advising Enrollees of the Significant Event and providing them an opportunity to transfer to another plan;

(4) Withholding payment of subscription income or restricting access to the Carrier's Letter of Credit account;

(5) Terminating the enrollment of those Enrollees who, in the judgment of OPM, would be adversely affected by the Significant Event; or

(6) Terminating this contract pursuant to Section 1.15, Renewal and Withdrawal of Approval.

(c) Prior to taking action as described in paragraph (b) of this clause, the OPM will notify the Carrier and offer an opportunity to respond.

(d) The carrier will insert this clause in any subcontract or subcontract modification if the amount of the subcontract or modification charged to the FEHB Program (or in the case of a community-rated carrier, applicable to the FEHB Program) equals or exceeds $550,000 and is at least 25 percent of the total subcontract cost. The amount of the dollar charge to the FEHB Program shall be adjusted by the same amount and at the same time as any change to the threshold for application of the Truth in Negotiations Act pursuant to 41 U.S.C. 254b(a)(7).

SECTION 1.11
FEHB INSPECTION (JUL 2005) (FEHBAR 1652.246-70)

(a) The Contracting Officer, or an authorized representative of the Contracting Officer, has the right to inspect or evaluate the work performed or being performed under the contract, and the premises where the work is being performed, at all reasonable times and in a manner that will not unreasonably delay the work.

(b) The Contractor shall maintain and the Contracting Officer, or an authorized representative of the Contracting Officer, shall have the right to examine and audit all books and records relating to the contract for purposes of the Contracting Officer's determination of the Carrier's subcontractor or Large Provider's compliance with the terms of the contract, including its payment (including rebate and other financial arrangements) and performance provisions. The Contractor shall make available at its office at all reasonable times those books and records for examination and audit for the record retention period specified in the Federal Employees Health Benefits Acquisition Regulation (FEHBAR), 48 CFR 1652.204-70. This subsection is applicable to subcontract and Large Provider Agreements with the exception of those that are subject to the "Audits and Records – Negotiation" clause, 48 CFR 52.215-2.

(c) If the Contracting Officer, or an authorized representative of the Contracting Officer, performs inspection, audit or evaluation on the premises of the Carrier, the subcontractor, or the Large Provider, the Carrier shall furnish or require the subcontractor or Large Provider to furnish all reasonable facilities for the safe and convenient performance of these duties.

(d) The Carrier shall insert this clause, including this subsection (d), in all subcontracts for underwriting and claim payments and administrative services and in all Large Provider Agreements and shall substitute "contractor", "Large Provider," or other appropriate reference for the term "carrier."

SECTION 1.12
CORRECTION OF DEFICIENCIES (JAN 1997)

(a) The Carrier shall maintain sufficient financial resources, facilities, providers, staff and other necessary resources to meet its obligations under this contract. If the OPM determines that the Carrier does not demonstrate the ability to meet its obligations under this contract, the OPM shall notify the Carrier of the asserted deficiencies. The Carrier agrees that, within ten (10) working days following notification, it shall present detailed plans for correcting the deficiencies. These plans shall be presented in a form prescribed by the OPM. Pending submission or implementation of plans required under this Section, the OPM may institute action as it deems necessary to protect the interests of Members, including, but not limited to:

(1) Suspending new enrollments under this contract;

(2) Advising Enrollees of the asserted deficiencies and providing them an opportunity to transfer to another plan;

(3) Withholding payment of subscription income or restricting access to the Carrier's Letter of Credit account; or

(4) Terminating the enrollment of those Enrollees who, in the judgment of OPM, would be adversely affected by the deficiency.

(b) The Carrier agrees that failure to submit or to diligently implement plans which are required under this Section shall constitute sufficient grounds for termination of this contract pursuant to Section 1.15, *Renewal and Withdrawal of Approval.*

(c) Prior to taking action as described in paragraph (a) the OPM shall notify the Carrier and offer an opportunity to respond.

(d) The Carrier shall include the substance of this clause in the contract with its underwriter and substitute an appropriate term for "Carrier."

## SECTION 1.13
## INFORMATION AND MARKETING MATERIALS (JAN 2005)

(a) OPM and the Carrier shall agree upon language setting forth the benefits, exclusions and other language of the Plan. The Carrier bears full responsibility for the accuracy of its FEHB brochure. OPM in its sole discretion, may order the Carrier to produce and distribute the agreed upon brochure text in a format and quantity approved by OPM, including an electronic 508 compliant brochure version, Section 508 of the Rehabilitation Act of 1973, as amended 29 U.S.C. § 794d, for OPM's web site. This formatted document is referred to as the FEHB brochure. The Carrier shall distribute the FEHB brochure on a timely basis to all Federal employees, annuitants, former spouses and former employees and dependents enrolled in the Plan. The Carrier shall also distribute the document(s) to Federal agencies to be made available to such individuals who are eligible to enroll under this contract. At the direction of OPM, the Carrier shall produce and distribute an audio cassette version of the approved language. The Carrier may print additional FEHB brochures for distribution for its own use, but only in the approved format and at its own expense.

(b) Supplemental material. Only marketing materials or other supplemental literature prepared in accordance with FEHBAR 1652.203-70 (Section 1.14 of this contract) may be distributed or displayed at or through Federal facilities.

(c) The Carrier shall reflect the statement of benefits in the agreed upon brochure text included at Appendix A of this contract, verbatim, in the FEHB brochure.

(d) OPM may order the Carrier to prepare an addendum or reissue the FEHB brochure or any piece(s) of supplemental marketing material at no expense to the Government if it is found to not conform to the agreed upon brochure text and/or supplemental marketing materials preparations described in paragraphs (a), (b) and (c) of this section.

## SECTION 1.14
## MISLEADING, DECEPTIVE OR UNFAIR ADVERTISING (JAN 1991) (FEHBAR 1652.203-70)

(a) The Carrier agrees that any advertising material, including that labeled promotional material, marketing material, or supplemental literature, shall be truthful and not misleading.

(b) Criteria to assess compliance with paragraph (a) of this clause are available in the *FEHB Supplemental Literature Guidelines* which are developed by OPM and should be used, along with the additional guidelines set forth in FEHBAR 1603.7002, as the primary guide in preparing material; further guidance is provided in the NAIC *Advertisements of Accident and Sickness Insurance Model Regulation.* The guidelines are periodically updated and provided to the Carrier by OPM.

(c) Failure to conform to paragraph (a) of this clause may result in a reduction in the service charge, if appropriate, and corrective action to protect the interest of Federal Members. Corrective action will be appropriate to the circumstances and may include, but is not limited to the following actions by OPM:

(1) Directing the Carrier to cease and desist distribution, publication, or broadcast of the material;

(2) Directing the Carrier to issue corrections at the Carrier's expense and in the same manner and media as the original material was made; and

(3) Directing the Carrier to provide, at the Carrier's expense, the correction in writing by certified mail to all enrollees of the Plan(s) that had been the subject of the original material.

(d) Egregious or repeated offenses may result in the following action by OPM:

(1) Suspending new enrollments in the Carrier's Plan(s);

(2) Providing Enrollees an opportunity to transfer to another plan; and

(3) Terminating the contract in accordance with Section 1.15, *Renewal and Withdrawal of Approval.*

(e) Prior to taking action as described in paragraphs (c) and (d) of this clause, the OPM will notify the Carrier and offer an opportunity to respond.

(f) The Carrier shall incorporate this clause in subcontracts with its underwriter, if any, and other subcontractors directly involved in the preparation or distribution of such advertising material and shall substitute "Contractor" or other appropriate reference for the term "Carrier."

SECTION 1.15
RENEWAL AND WITHDRAWAL OF APPROVAL (JAN 1991) (FEHBAR 1652.249-70)

(a) The contract renews automatically for a term of one (1) year each January first, unless written notice of non-renewal is given either by OPM or the Carrier not less than 60 calendar days before the renewal date, or unless modified by mutual agreement.

(b) This contract also may be terminated at other times by order of OPM pursuant to 5 U.S.C. 8902(e). After OPM notifies the Carrier of its intent to terminate the contract, OPM may take action as it deems necessary to protect the interests of Members, including but not limited to--

(1) Suspending new enrollments under the contract;

(2) Advising Enrollees of the asserted deficiencies; and

(3) Providing Enrollees an opportunity to transfer to another plan.

(c) OPM may, after proper notice, terminate the contract at the end of the contract term if it finds that the Carrier did not have at least 300 Enrollees enrolled in its Plan at any time during the two preceding contract terms.

SECTION 1.16
SUBCONTRACTS (JUL 2005) (FEHBAR 1652.244-70)

(a) The Carrier will notify the Contracting Officer in writing at least 30 days in advance of entering into any subcontract or subcontract modification, or as otherwise specified by this contract, if the amount of the subcontract or modification charged to the FEHB Program equals or exceeds $550,000 and is at least 25 percent of the total subcontract cost. The amount of the dollar charge to the FEHB Program shall be adjusted by the same amount and at the same time as any

change to the threshold for application of the Truth in Negotiations Act pursuant to 41 U.S.C. 254b(a)(7). Failure to provide advance notice may result in a Contracting Officer's disallowance of subcontract costs or a penalty in the performance aspect of the Carrier's service charge. In determining whether the amount chargeable to the FEHB Program contract for a given subcontract or modification equals or exceeds the $550,000 threshold, the following rules apply:

(1) For initial advance notification, the Carrier shall add the total cost/price for the base year and all options, including quantity or service options and option periods.

(2) For contract modifications, options and/or renewals (e.g. evergreen contracts) not accounted for in paragraph (a)(1) of this clause, the carrier shall provide advance notification if they cause the total price to equal or exceed the threshold. OPM's review will be of the modification(s), itself, but documentation for the original subcontract will be required to perform the review. The $550,000 threshold will be adjusted by the same amount and at the same time as any change to the threshold for application of the Truth in Negotiations Act. All subcontracts or subcontract modifications that equal or exceed the threshold are subject to audit under FAR 52.215-2 "Audit and Records-Negotiations" if based on cost analysis or 48 CFR 1646.301 and 1652.246-70 "FEHB Inspection" if based on price analysis.

(b) The advance notification required by paragraph (a) of this clause shall include the information specified below:

(1) A description of the supplies or services to be subcontracted;

(2) Identification of the type of subcontract to be used;

(3) Identification of the proposed subcontractor and an explanation of why and how the proposed subcontractor was selected, including the competition obtained;

(4) The proposed subcontract price and the Carrier's cost or price analysis;

(5) The subcontractor's current, complete, and accurate cost or pricing data and Certificate of Current Cost or Pricing Data, must be submitted to the Contracting Officer if required by law, regulation, or other contract provisions.

(6) (Reserved)

(7) A negotiation memorandum reflecting--

(i) The principal elements of the subcontract price negotiations;

(ii) The most significant consideration controlling establishment of initial or revised prices;

(iii) An explanation of the reason cost or pricing data are not required, if the Carrier believes that cost or pricing data are not required.

(iv) The extent, if any, to which the Carrier did not rely on the subcontractor's cost or pricing data in determining the price objective and in negotiating the final price;

(v) The extent, if any, to which it was recognized in the negotiation that the subcontractor's cost or pricing data were not accurate, complete, or current; the action taken by the Carrier and the subcontractor; and the effect of any such defective data on the total price negotiated;

(vi)The reasons for any significant difference between the Carrier's price objective and the price negotiated; and

(vii) A complete explanation of the incentive fee or profit plan when incentives are used. The explanation will identify each critical performance element, management decisions used to quantify each incentive element, reasons for the incentives, and a summary of all trade-off possibilities considered.

(c) The Carrier will obtain the Contracting Officer's written consent before placing any subcontract for which advance notification is required under paragraph (a) of this clause. However, the Contracting Officer may ratify in writing any such subcontract for which written consent was not obtained. Ratification will constitute the consent of the Contracting Officer.

(d) The Contracting Officer may waive the requirement for advance notification and consent required by paragraphs (a), (b) and (c) of this clause where the Carrier and subcontractor submit an application or renewal as a contractor team arrangement as defined in FAR Subpart 9.6 and--

(1) The Contracting Officer evaluated the arrangement during negotiation of the contract or contract renewal; and

(2) The subcontractor's price and/or costs were included in the Plan's rates that were reviewed and approved by the Contracting Officer during negotiation of the contract or contract renewal.

(e) If the carrier follows the notification and consent requirements of paragraphs (a), (b) and (c) of this clause and subsequently obtains the Contracting Officer's consent or ratification, then the reasonableness of the subcontract's costs will be inferred as provided for in 1631.205-81. However, consent or ratification by the Contracting Officer will not constitute a determination:

(1) Of the acceptability of any subcontract terms or conditions;

(2) Of the allowability of any cost under this contract; or

(3) That the Carrier should be relieved of any responsibility for performing this contract.

(f) No subcontract placed under this contract will provide for payment on a cost-plus-a-percentage-of-cost basis. Any fee payable under cost reimbursement type subcontracts will not exceed the fee limitations in FAR 15.404-4(c)(4)(i). Any profit or fee payable under a subcontract will be in accordance with the provision of Section 3.7, *Service Charge*.

(g) The Carrier will give the Contracting Officer immediate written notice of any action or suit filed and prompt notice of any claim made against the Carrier by any subcontractor or vendor that, in the opinion of the Carrier, may result in litigation related in any way to this contract with respect to which the Carrier may be entitled to reimbursement from the Government.

SECTION 1.17
NOVATION AGREEMENT (JAN 1996)

The agreement at FEHBAR 1642.1204 shall be submitted for approval to OPM when the Carrier's assets or the entire portion of the assets pertinent to the performance of this contract, as determined by the Government, are transferred.

SECTION 1.18
AGREEMENT TO RECOGNIZE CARRIER'S CHANGE OF NAME (JAN 1996)

The agreement at FEHBAR 1642.1205 shall be submitted for approval to OPM when the carrier changes its name and the Government's and Contractor's rights and obligations remain unaffected.

SECTION 1.19

UNDERWRITER (JAN 1991)

(a) If this Plan is underwritten, the Carrier agrees not to modify (except as allowed in Section 2.3, *Payment of Benefits and Provision of Services and Supplies*) or terminate the policy issued by the Underwriter of the Plan or give notice of termination or intent not to renew the policy without prior express approval of the Contracting Officer. The Carrier shall notify the Contracting Officer in writing of its decision to change Underwriters as soon as is reasonable after the decision is made but no later than at the time the Carrier submits its benefit and rate proposal to OPM for the succeeding contract term.

(b) In the event of any inconsistency between the terms of this contract between OPM and the Carrier and the terms of the policy issued by the Underwriter to the Carrier, the terms of this contract shall prevail.

(c) If this Plan is underwritten, the policy issued to the Carrier by its Underwriter is a part of this contract and is incorporated therein by reference. The Carrier shall include paragraph (b) in the contract with its Underwriter.

SECTION 1.20
CERTIFICATION UNDER P.L. 104-191 (HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996) (JAN 1998)

The Carrier will issue a certification of coverage for members in accordance with the regulations issued by the Department of Health and Human Services.

SECTION 1.21
PATIENTS' BILL OF RIGHTS (JAN 1999)

(a) The Carrier shall implement the recommendations in the Health Care Consumer Bill of Rights and Responsibilities ("Patients' Bill of Rights") in accordance with OPM guidance.

(b) During the Carrier's provider contract renewal process, the Carrier shall make any necessary modifications to such provider contracts to comply with the recommendations of the Patients' Bill of Rights in accordance with OPM guidance. All new provider contracts with the Carrier shall comply with the recommendations of the Patients' Bill of Rights in accordance with OPM guidance.

SECTION 1.22
ADMINISTRATIVE SIMPLIFICATION-HIPAA (JAN 2008)

(a) The Carrier shall implement and be in compliance with the Department of Health and Human Services (DHHS) regulations regarding the standards for electronic transactions, code sets and unique identifiers on the date DHHS specifies. Subject to paragraph (c) of this section, the regulations at 45 CFR parts 160 and 162 are incorporated by reference in this contract.

(b) The Carrier shall implement and be in compliance with the DHHS regulations regarding the standards for privacy and security of individually identifiable health information on the date DHHS specifies. Subject to paragraph (c) of this section, the regulations at 45 CFR parts 160 and 164 are incorporated by reference in this contract.

(c) Because OPM has determined that the DHHS administrative simplification regulations should serve as a uniform nationwide standard for the FEHB Program, and because of the preemption provision at 5 U.S.C. 8902(m)(1), the provisions of 45 CFR part 160, subpart B are inapplicable to the Carrier with respect to the Plan.

(d) If the Carrier is an employee organization that retains an underwriter, then these requirements also apply to the underwriter with respect to the Plan. If the Carrier for the plan authorized under 5 U.S.C. 8903(l), qualifies for limited application of the HHS Privacy Rule as a business associate, then the HHS Privacy Rule requirements apply to the underwriting participating affiliates.

## SECTION 1.23
## HIPAA COMPLIANCE (JAN 1998)

(a) The Carrier shall comply with and shall take all steps reasonably necessary to ensure that its affiliates, subcontractors, and agents comply with the guaranteed availability provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and implementing regulations. "Guaranteed availability" means the Carrier, affiliates, subcontractors, and agents do not engage in practices that: 1) decline to offer health insurance coverage (as defined in section 2791(b)(1) of the Public Health Service Act "the Act" ) to, or deny enrollment of an eligible individual (as defined in section 2741(b) of the Act); or, 2) impose any preexisting condition exclusion (as defined in section 2701(b)(1)(A) of the Act), with respect to such coverage.

(b) A State or Federal enforcement action as the result of noncompliance with the requirements of HIPAA is a significant event under Section 1.10 of this contract, Notice of Significant Events. If the Carrier, or any affiliate, subcontractor, or agent, is notified of any enforcement action by any Federal or State authority with regard to HIPAA compliance, the Carrier must notify OPM within ten working days of learning of the action.

## SECTION 1.24
## NOTICE ON TERMINATION OF FEHBP OR PROVIDER CONTRACT (JAN 2003)

(a) Members who are undergoing treatment for a chronic or disabling condition or who are in the second or third trimester of pregnancy at the time a carrier terminates (1) its FEHBP contract, (2) the members' specialty provider contract, or (3) a Preferred Provider Organization (PPO) or Point of Service (POS) network contract, for reasons other than cause, may be able to continue to see their specialty provider for up to 90 days or through their postpartum care.

(b) The Carrier shall notify its members in writing of its intent to terminate its FEHBP contract, the members' specialty provider contract, or a PPO or POS network contract, for reasons other than cause, in order to allow sufficient time for the members to arrange for continued care after the 90-day period or their postpartum care, whichever applies. The Carrier shall send the required notice to the member if the Carrier has in its records an address for the member different from the enrollee's address; otherwise, the Carrier may send the notice to the enrollee. The Carrier shall send the notice in time to ensure it is received by the members no less than 90 days prior to the date it terminates the contract, unless the Carrier demonstrates it was prevented from doing so for reasons beyond its control. The Carrier's prompt notice will ensure that the notification period and the transitional care period run concurrently.

SECTION 1.25
TRANSITIONAL CARE (JAN 2003)

(a) "Transitional care" is specialized care provided for up to 90 days or through the postpartum period, whichever is later, to a member who is undergoing treatment for a chronic or disabling condition or who is in the second or third trimester of pregnancy when the Carrier terminates (1) its FEHBP contract, (2) the member's specialty provider contract, or (3) a Preferred Provider Organization (PPO) or Point of Service (POS) network contract for reasons other than cause. The 90-day period begins the earlier of the date the member receives the notice required under Section 1.24, Notice on Termination of FEHBP or Provider Contract, or the date the Carrier's or the provider's contract ends.

(b) The Carrier shall ensure the following:

(1) If it terminates a specialty provider contract or a PPO or POS network contract other than for cause, it allows members who are undergoing treatment for a chronic or disabling condition or who are in the second or third trimester of pregnancy to continue treatment under the specialty provider for up to 90 days, or through their postpartum period, whichever is later, under the same terms and conditions that existed at the beginning of the transitional care period; and

(2) If it enrolls a new member who voluntarily changed carriers because the member's former carrier was no longer available in the FEHB Program, it provides transitional care for the member if he or she is undergoing treatment for a chronic or disabling condition or is in the second or third trimester of pregnancy for up to 90 days, or through the postpartum period, whichever is later, under the same terms and conditions the member had under the prior carrier.

(c) In addition, the Carrier shall (1) pay for or provide the transitional care required under this clause at no additional cost to members;

(2) require the specialty provider or network to promptly transfer all medical records to the designated new provider during or upon completion of the transition period, as authorized by the patient; and,

(3) require the specialty provider or network to give all necessary information to the Carrier for quality assurance purposes.

SECTION 1.26
STANDARDS FOR PHARMACY BENEFIT MANAGEMENT COMPANY (PBM)
ARRANGEMENTS (JAN 2008)

The Carrier will ensure that the following standards are included in new, renewing or amended contracts with vendors providing a retail pharmacy network and/or a mail order pharmacy to enrollees and dependents (hereafter "PBM") effective on or after January 2, 2005, and, through amendment, all existing contracts by January 1, 2006.

(a) Transparency Standards

(1) The PBM is not majority-owned or majority-controlled by a pharmaceutical manufacturing company.

(2) The PBM agrees to credit to the Health Plan either as a price reduction or by cash refund all Manufacturer Payments to the extent negotiated, if such an arrangement exists

between the Carrier and the PBM. Manufacturer Payments are any and all compensation or remuneration the PBM receives from a pharmaceutical manufacturer, including but not limited to, discounts; credits; rebates, regardless of how categorized; market share incentives, commissions, and administrative or management fees. The term also includes any fees received for sales of utilization data to a pharmaceutical manufacturer. This term does not include purchase discounts based upon invoiced purchase terms.

(3) If the Carrier has negotiated with the PBM to receive all or a portion of Manufacturer Payments as described in (2) above, the PBM will provide the Carrier with quarterly and annual Manufacturer Payment Reports identifying the following information. This information shall be presented for both the total of all prescription drugs dispensed through the PBM, acting as a mail order pharmacy, and its retail network and in the aggregate for the 25 brand name drugs that represent the greatest cost to the Health Plan or such number of brand name drugs that together represent 75% of the total cost to the Health Plan, whichever is the greater number:

(i) the dollar amount of Total Product Revenue for the reporting period, with respect to the PBM's entire client base. Total Product Revenue is the PBM's net revenue which consists of sales of prescription drugs to clients, either through retail networks or PBM-owned or controlled mail order pharmacies. Net revenue is recognized at the prescription price negotiated with clients and associated administrative fees;

(ii) the dollar amount of total drug expenditures for the Health Plan;

(iii) the dollar amount of all Manufacturer Payments earned by the PBM for the reporting period;

(iv) the percentage of all Manufacturer Payments earned by the PBM for the reporting period that were Manufacturer Formulary Payments, which are payments the PBM receives from a manufacturer in return for formulary placement and/or access, or payments that are characterized as "formulary" or "base" rebates or payments pursuant to the PBM's agreements with pharmaceutical manufacturers;

(v) the percentage of all Manufacturer Payments received by the PBM during the reporting period that were Manufacturer Additional Payments, which are all Manufacturer Payments other than Manufacturer Formulary Payments.

(4) The PBM agrees to provide the Carrier, at least annually, with all financial and utilization information requested by the Carrier relating to the provision of benefits to eligible enrollees through the PBM and all financial and utilization information relating to services provided to Carrier.

(5) The Carrier agrees to provide any information it receives from the PBM, including a copy of its contract with the PBM to OPM. A PBM providing information to a Carrier under this subsection may designate that information as confidential commercial information. The PBM, by contracting with the Carrier, consents to the disclosure of this information to OPM. OPM shall treat such designated information as confidential. However, this information may be subject to FOIA disclosure under 5 C.F.R. § 294.112.

(6) If the Health Plan's PBM arrangement is with an Underwriter rather than with the Carrier, then all references to the Carrier appearing in this Section 1.26 shall be deemed to be references to the Underwriter.

(b) Integrity Standard

The Carrier will require that its PBM contractors agree to adopt and adhere to a code of ethics promulgated by a national professional association, such as the Code of Ethics of the American Pharmacists Association (dated October 27, 1994), for their employed pharmacists.

(c) Performance Standards

The Carrier will require that its PBM contractors develop and apply a quality assurance program specifying procedures for insuring contract quality on the following standards at a minimum and submit reports to the Carrier on their performance. PBMs must meet, at minimum, the member inquiry, telephone customer service, paper claims processing, and other applicable standards set for carriers at Section 1.9(f)(1), (2), (5), (7), and (8). All other standards discussed below will have specific target goals the PBM is expected to achieve. Carriers may permit PBMs to measure compliance using statistically valid samples for the PBMs book of business. Agreed to standards shall be provided to OPM for its review and comment. If OPM has concerns about a particular standard, the Carrier agrees to present OPM's concerns to the PBM and either revise the standard as requested by OPM or revise the standard to the extent feasible and present to OPM information demonstrating the problems associated with making the requested revisions in full.

(1) Retail Pharmacy Standards

    (i)    Point of Service (POS) system response time. The PBM's network electronic transaction system provides rapid response to network pharmacies.

    (ii)    POS system availability. The PBM's network electronic transaction system generally is available to, and accessible by, network pharmacies.

    (iii)    Licensing – The PBM verifies the appropriate licensing of its network pharmacies.

(2) Mail Service Pharmacy Standards

    (i)    Dispensing accuracy – The PBM dispenses its prescriptions to the correct patient and for the correct drug, drug strength and dosage in accordance with the physician's prescription not less than 99.9% of the time.

    (ii)    Turnaround time – The PBM promptly dispenses and ships at least 98% on average of all prescriptions not requiring intervention or clarification within 3 business days or meets an equivalent measure approved by OPM.

(4) Prior Approval – if applicable – The PBM promptly reviews and responds to requests for prior approval for specific drugs following receipt of all required information.

(d) Alternative Drug Options

The Carrier will require that its PBM contractors, at a minimum, utilize the following protocols for PBM initiated drug interchanges (any change from the original prescription) other than generic substitutions:

    (i)    The PBM must treat the prescribing physician, and not itself, as the ultimate decision-maker. Furthermore, to the extent appropriate under the circumstances, the PBM must allow the patient input into that decision-making process. At a

minimum, the PBM must provide the patient with a written notice in the package sent to the patient that the drug interchange has occurred with the approval of the Prescriber.

(ii)     The PBM will obtain authorization for a drug interchange only with the express, verifiable authorization from the Prescriber as communicated directly by the Prescriber, in writing or verbally, or by a licensed medical professional or other physician's office staff member as authorized by the Prescriber.

(iii)    The PBM must memorialize in appropriate detail all conversations with patients and physicians in connection with drug interchanging requests, including the identity of the contact person at the physician's office and the basis for his or her authority.

(iv)     The PBM will only interchange a patient's drug from a lower priced drug to a higher priced drug to patient or Plan when authorized by the Carrier or the Plan.

(v)      The PBM will permit pharmacists to express their professional judgment to both the PBM and physicians on the impact of drug interchanges and to answer physicians' questions about dosing. PBMs will not require pharmacists to, and will not penalize pharmacists for refusing to, initiate calls to physicians for drug interchanges that in their professional judgment should not be made.

(vi)     The PBM will offer to disclose, and if requested, will disclose to physicians, the Carrier, and patients (i) the reason(s) why it is suggesting a drug interchange and (ii) how the interchange will affect the PBM, the Plan, and the patients financially.

SECTION 1.27
DISCLOSURE NOTICE UNDER P.L. 108-173 (MEDICARE MODERNIZATION ACT OF 2003) (JAN 2006)

The Carrier will issue, as part of its FEHB benefits brochure, a disclosure notice concerning creditable prescription drug coverage in accordance with the regulation at 42 CFR §423.56 issued by the Department of Health and Human Services.

SECTION 1.28
CARRIER DISASTER RECOVERY PLAN (JAN 2007)

The Carrier must implement a disaster recovery plan that addresses flexibility for the following:
(a) Medical and pharmacy procedures and requirements
(b) Barriers to accessing needed health care;
(c) Requests for out-of-network medical services;
(d) Alternatives for medical pre-certification, referrals, medical necessity review and notification of hospital admissions;
(e) Accessing other PCPs or specialists;
(f) Pharmacy restrictions, refills, additional supplies of medications as backup;
(g) Mail-order pharmacy;
(h) Adhering to recommendations for vaccinations from the Center for Disease Control;

(i) Claims payments;
(j) Crisis toll free hotline;
(k) Ability to identify current members;
(l) Recovery procedures for critical business functions (i.e., system, network, communication, work area recovery); and
(m) Secure backup site (hot/cold). A "hot work site" is a designated location to be used in the event of a disaster that is fully prepared for continuation of work to which the employees can go. A "cold work site" is a designated location to use in the event of a disaster that is not fully prepared for continuation of work to which the employees can go.

The Carrier must provide OPM with the following information:
(a) description of its disaster recovery plan;
(b) the carrier's current state of readiness and the frequency of evaluations;
(c) the carrier's work with its subcontractor on this issue;
(d) a timeline; and
(e) any potential problem areas.

The Carrier may implement its own additional measures.

Carriers must submit this information by January 1, 2007. Carriers who enter the FEHBP subsequent to 2007, must submit this information by January 1st of their first FEHBP contract year. Any material changes to the disaster recovery plan, such as a prime disaster recovery subcontract change or a hot site change, should be reported to OPM.

SECTION 1.29
HEALTH INFORMATION TECHNOLOGY REQUIREMENTS (JAN 2008)

(a) The Carrier agrees that as it implements, acquires, or upgrades health information technology systems, it shall utilize, where available, certified health information technology systems and products that meet interoperability standards recognized by the Secretary of Health and Human Services, as existing on the date of the implementation, acquisition, or upgrade of health information technology systems ("Interoperability Standards").

(b) The Carrier agrees that such health information technology systems will have already been pilot tested in a variety of live settings and refined, if needed, before the Carrier will consider them for implementation.

(c) The Carrier agrees that as its provider agreements are established or renewed, it will encourage contracted providers to comply with applicable Interoperability Standards.

SECTION 2.1
ENROLLMENT ELIGIBILITY AND EVIDENCE OF ENROLLMENT (JAN 1999)

(a) <u>Enrollment</u>.
(1) Each eligible individual who wishes to be enrolled in the plan offered by this Carrier shall, as a prerequisite to such enrollment, complete a Health Benefits Election Form, or use an electronic or telephonic method approved by OPM, within the time and under the conditions specified in 5 CFR Part 890. The Government personnel office having cognizance over the Enrollee shall promptly furnish notification of such election to the Carrier.
(2) A person's eligibility for coverage, effective date of enrollment, the level of benefits (option), the effective date of termination or cancellation of a person's coverage, the date any extension of a person's coverage ceases, and any continuance of benefits beyond a period of enrollment and the date any such continuance ceases, shall all be determined in accordance with regulations or directions of OPM given pursuant to chapter 89, title 5, United States Code.
(b) <u>Special Limitations With Regard To Employee Organizations</u>.
(1) A plan sponsored by an employee organization as defined by the Act, is available only to eligible employees, annuitants, former spouses, and former employees and dependents (and eligible members of their families) who must be or must become members of the sponsoring organization to enroll in the Plan.
(2) Employees with membership status in an employee organization at the time they become annuitants may retain their membership in the organization and, if eligible, continue their enrollment in the Plan. Survivor annuitants of Enrollees in the Plan may continue their enrollment in the Plan without becoming members of the sponsoring employee organization.
(c) The Carrier shall issue evidence of the Enrollee's coverage and furnish to the Enrollee copies of any forms necessary to make claim for benefits.

SECTION 2.2
BENEFITS PROVIDED (JAN 2007)

(a) The Carrier shall provide the benefits as described in the agreed upon brochure text found in Appendix A.
(b) In addition to providing benefits in accordance with (a) above, the Carrier shall be authorized to modify them as follows:
(1) To permit methods of treatment not expressly provided for, but not prohibited by law, rule or Federal policy, if otherwise contractually appropriate, and if such treatment is medically necessary and is as cost effective as providing benefits to which the Member may otherwise be entitled.
(2) To pay for or provide a health service or supply in an individual case which does not come within the specific benefit provisions of the contract, if the Carrier determines the benefit is within the intent of the contract, and the Carrier determines that the provision of such benefit is in the best interests of the Federal Employees Health Benefits Program.
(3) In individual cases, the Carrier, after consultation with and concurrence by the Member and provider(s), may offer a benefit alternative not ordinarily covered under this

contract which will result in equally effective medical treatment at no greater benefit cost. An alternative benefit will be made available for a limited time period and is subject to the Carrier's ongoing review. Members must cooperate with the Carrier's review process.

(c)The decision to offer, deny, or withdraw coverage for a modified an alternative benefit is solely the Carrier's discretion (unless the Carrier and member have entered into an alternative benefits agreement that expressively modifies this authority), and is not subject to OPM review under the disputed claims process.

(d) In each case when the Carrier provides a non-covered benefit in accordance with (b) above, the authority of (b) above, the Carrier shall document in writing prior to the provision of such benefit the reasons and justification for its determination. The writing may be in the form of an alternative benefit agreement with the Member. Such payment or provision of services or supplies while a valid charge under the contract shall not be considered to be a precedent in the disposition of similar cases or extensions in the same case beyond the approved period.

(e) Except as provided for in (b) above, the Carrier shall provide benefits for services or supplies in accordance with Appendix A.

(f) The Carrier, subject to (g) below, shall determine whether in its judgment a service or supply is medically necessary or payable under this contract.

(g) The Carrier agrees to pay for or provide a health service or supply in an individual case if OPM finds that the Member is entitled thereto under the terms of the contract.

## SECTION 2.3
## PAYMENT OF BENEFITS AND PROVISION OF SERVICES AND SUPPLIES (JAN 2003)

(a) By enrolling or accepting services under this contract, Members are obligated to all terms, conditions, and provisions of this contract. The Carrier may request Members to complete reasonable forms or provide information which the Carrier may reasonably request, provided, however, that the Carrier shall not require Members to complete any form as a precondition of receiving benefits unless the form has first been approved for use by OPM. Notwithstanding Section 2.9, *Claims Processing*, forms requiring specific approval do not include claim forms and other forms necessary to receive payment of individual claims.

(b) All benefits shall be paid (with appropriate documentation of payment) within a reasonable time after receipt of reasonable proof covering the occurrence, character, and extent of the event for which the claim is made. The claimant shall furnish satisfactory evidence that all services or supplies for which expenses are claimed are covered services or supplies within the meaning of the contract.

(c) The procedures and time period for filing claims shall be as specified in the agreed upon brochure text (*Appendix A*). However, failure to file a claim within the time required shall not in itself invalidate or reduce any claim where timely filing was prevented by administrative operations of Government or legal incapacitation, provided the claim was submitted as soon as reasonably possible.

(d) The Carrier may request a Member to submit to one or more medical examinations to determine whether benefits applied for are for services and supplies necessary for the diagnosis or treatment of an illness or injury or covered condition of the Member and may withhold payment of such benefits pending completion of the examinations. The examinations shall be made at the expense of the Carrier by a physician selected by the Member from a panel of at

(FFS-2008)

least three physicians whose names are furnished by the Carrier, and the results of the examinations shall be made available to the Carrier and the Member.

(e) As a condition precedent to the provision of benefits hereunder, the Carrier, to the extent reasonable and necessary and consistent with Federal law, shall be entitled to obtain from any person, organization or Government agency, including the Office of Personnel Management, all information and records relating to visits or examination of, or treatment rendered or supplies furnished to, a Member as the Carrier requires in the administration of such benefits. The Carrier may obtain from any insurance company or other organization or person any information, with respect to any Member, which it has determined is reasonably necessary to:

(1) identify enrollment in a plan,

(2) verify eligibility for payment of a claim for health benefits, and

(3) carry out the provisions of the contract, such as subrogation, recovery of payments made in error, workers compensation, and coordination of benefits.

(f) Benefits are payable to the Enrollee in the Plan or his or her assignees. However, under the following circumstances different payment arrangements are allowed:

(1) Reimbursement Payments for the Enrollee. If benefits become payable to the estate of an Enrollee or an Enrollee is a minor, or an Enrollee is physically or mentally not competent to give a valid release, the Carrier may either pay such benefits directly to a hospital or other provider of services or pay such benefits to any relative by blood or connection by marriage of the Enrollee determined by the Carrier to be equitably entitled thereto.

(2) Reimbursement Payments for a minor child. If a child is covered as a family member under the Enrollee's self and family enrollment and is in the custody of a person other than the Enrollee, and if that other person certifies to the Carrier that he or she has custody of and financial responsibility for the dependent child, then the Carrier may issue an identification card for the dependent child(ren) to that person and may reimburse that person for any covered medical service or supply.

(3) Reimbursement Payments to family members covered under the Enrollee's self and family enrollment. If a covered child is legally responsible, or if a covered spouse is legally separated, and if the covered person does not reside with the Enrollee and certifies such conditions to the Carrier, then the Carrier may issue an identification card to the person and may reimburse that person for any covered medical service or supply. In the case of a legally separated spouse, the Carrier may also furnish the explanation of benefits to the spouse when determined by the Carrier to be required.

(4) Reimbursement payments to Government programs, such as Medicaid. If Federal law provides that reimbursement is payable to a Government program under coordination of benefits or similar rules, in lieu of being payable to the Enrollee or other covered person, the Carrier may reimburse the other Government program for any covered medical service or supply. To the degree that the Carrier is able to identify Medicaid beneficiaries, the Carrier will process claims directly to the provider of service or reimburse the Medicaid agency if the Medicaid agency has already paid the provider and is seeking reimbursement. When this situation is identified, the Carrier will update the member's records to ensure proper adjudication of claims.

(5) Compliance with the HIPAA Privacy Rule. The Carrier may pay benefits to a covered person other than the Enrollee when in the exercise of its discretion the Carrier decides that such action is necessary to comply with the HIPAA Privacy Rule, 45 C.F.R. §164.500 et seq.

(6) Any payments made in good faith in accordance with paragraphs (f)(1) through (f)(5) shall fully discharge the Carrier to the extent of such payment.

(FFS-2008)

(g) *Erroneous Payments.* If the Carrier or OPM determines that a Member's claim has been paid in error for any reason (except in the case of fraud or abuse), the Carrier shall make a prompt and diligent effort to recover the erroneous payment to the member from the member or, if to the provider, from the provider. The Carrier shall follow general business practices and procedures in collecting debts owed under the Federal Employees Health Benefits Program. Prompt and diligent effort to recover erroneous payments means that upon discovering that an erroneous payment exists, the Carrier shall--

(1) Send a written notice of erroneous payment to the member or provider that provides: (A) an explanation of when and how the erroneous payment occurred, (B) when applicable, cite the appropriate contractual benefit provision, (C) the exact identifying information (i.e., dollar amount paid erroneously, date paid, check number, date of service and provider name), (D) a request for payment of the debt in full, and (E) an explanation of what may occur should the debt not be paid, including possible offset to future benefits. The notice may also offer an installment option. In addition, the Carrier shall provide the debtor with an opportunity to dispute the existence and amount of the debt before proceeding with collection activities;

(2) After confirming that the debt does exist and in the appropriate amount, send follow-up notices to the member or the provider at 30, 60 and 90 day intervals, if the debt remains unpaid and undisputed;

(3) The Carrier may off-set future benefits payable to the member or to a provider on behalf of the member to satisfy a debt due under the FEHBP if the debt remains unpaid and undisputed for 120 days after the first notice;

(4) After applying the first three steps, refer cases when it is cost effective to do so to a collection attorney or a collection agency if the debt is not recovered;

(5) Make prompt and diligent effort to recover erroneous payments until the debt is paid in full or determined to be uncollectible by the Carrier because it is no longer cost effective to pursue further collection efforts or it would be against equity and good conscience to continue collection efforts;

(6) Suspend recovery efforts for a debt which is based upon a claim that has been appealed as a disputed claim under Section 2.8, until the appeal has been resolved;

(7)(i) The Carrier may charge the contract for benefit payments made erroneously but in good faith provided that it can document that it made a prompt and diligent effort to recover erroneous payments as described above.

(ii) Notwithstanding (g)(7)(i), the Carrier may not charge the contract for the administrative costs to correct erroneous benefit payments (or to correct processes or procedures that caused erroneous benefit payments) when the errors are egregious or repeated. These costs are deemed to be unreasonable and unallowable under section 3.2(b)(2)(ii);

(8) Maintain records that document individual unrecovered erroneous payment collection activities for audit or future reference.

(9) At the request of OPM, the Carrier shall provide evidence that it has taken the steps enumerated above in this subsection to promptly recover erroneous payments identified through the OPM audit process, including but not limited to overpayments related to Medicare coordination of benefits. The Contracting Officer may require the Carrier to establish and submit to the Contracting Officer a written corrective action plan.

(h) Erroneous payment recoveries may be reduced by any legal or collection agency fees expended to obtain the recoveries and which are not otherwise payable under this experience-rated contract. The amount credited to the contract shall be the net amount remaining after deducting the related legal or collection agency fees.

(i) All health benefit refunds and recoveries, including erroneous payment recoveries, must be deposited into the working capital or investment account within 30 days and returned to or accounted for in the FEHBP letter of credit account within 60 days after receipt by the Carrier.

(j) Notwithstanding subsection (f), the Carrier reserves the right to pay the Member directly for all covered services described in the agreed upon brochure text attached as Appendix A.

(10) In compliance with the provisions of the Contract Disputes Act, the Carrier shall return to the Program an amount equal to the uncollected erroneous payment where the Contracting Officer determines that (a) the Carrier's failure to appropriately apply its operating procedure caused the erroneous payment and (b) that the Carrier failed to make a prompt and diligent effort to recover an erroneous payment.

## SECTION 2.4
## TERMINATION OF COVERAGE AND CONVERSION PRIVILEGES (JAN 1996)

(a) A Member's coverage is terminated as specified in regulations issued by the OPM. Benefits after termination of coverage are as specified in the regulations.

(b) A Member is entitled to a temporary continuation of coverage or an extension of coverage under the conditions and to the extent specified in the regulations.

(c) A Member whose coverage hereunder has terminated is entitled, upon application within the times and under the conditions specified in regulations, to a non-group contract regularly offered for the purpose of conversion from the contract or similar contracts. The conversion contract shall be in compliance with 5 U.S.C., chapter 89, and regulations issued thereunder.

(d) Costs associated with writing or providing benefits under conversion contracts shall not be an allowable cost of this contract.

(e) The Carrier shall maintain on file with OPM copies of the conversion policies offered to persons whose coverage under this contract terminates and advise OPM promptly of any changes in the policies. The Contracting Officer may waive this requirement where because of the large number of different conversion policies offered by the Carrier it would be impractical to maintain a complete up-to-date file of all policies. In this case the Carrier shall submit a representative sample of the general types of policies offered and provide copies of specific policies on demand.

## SECTION 2.5
## SUBROGATION (JAN 2006)

(a) The Carrier's subrogation rights, procedures and policies, including recovery rights, shall be in accordance with the provisions of the agreed upon brochure text, which is incorporated in this Contract in Appendix A. As the member is obligated by Section 2.3(a) to comply with the terms of this Contract, the Carrier, in its discretion, shall have the right to file suit in federal court in order to enforce those rights.

(b) Subrogation recoveries may be reduced by any legal fees expended to obtain the recoveries and which are not otherwise payable under this experience-rated contract. The amount credited to the contract shall be the net amount remaining after deducting the related legal fees.

(FFS-2008)

SECTION 2.6
COORDINATION OF BENEFITS (JAN 2001) (FEHBAR 1652.204-71)

(a) The Carrier shall coordinate the payment of benefits under this contract with the payment of benefits under Medicare, other group health benefits coverages, and the payment of medical and hospital costs under no-fault or other automobile insurance that pays benefits without regard to fault.

(b) The Carrier shall not pay benefits under this contract until it has determined whether it is the primary carrier or unless permitted to do so by the Contracting Officer.

(c) In coordinating benefits between plans, the Carrier shall follow the order of precedence established by the NAIC Group Coordination of Benefits Model Regulation, Rules for Coordination of Benefits, as specified by OPM.

(d) Where (1) the Carrier makes payments under this contract which are subject to COB provisions; (2) the payments are erroneous, not in accordance with the terms of the contract, or in excess of the limitations applicable under this contract; and (3) the Carrier is unable to recover such COB overpayments from the Member or the providers of services or supplies, the Contracting Officer may allow such amounts to be charged to the contract; the Carrier must be prepared to demonstrate that it has made a diligent effort to recover such COB overpayments.

(e) COB savings shall be reported by experience-rated carriers each year along with the Carrier's annual accounting statement in a form specified by OPM.

(f) Changes in the order of precedence established by the NAIC Group Coordination of Benefits Model Regulation, Rules for Coordination of Benefits, implemented after January 1 of any given year shall be required no earlier than the beginning of the following contract term.

*[NOTE: In the event that benefits are payable to the Member under no-fault automobile insurance, the no-fault automobile insurer shall be the Primary Carrier if it is obligated legally to pay benefits for health care expenses without regard to other health benefits coverage that the Member may have. The term "no-fault automobile insurance" includes any automobile insurance policy under which the insurer pays benefits for health care expenses resulting from the accident without regard to whether the insured's conduct contributed to the accident.]*

SECTION 2.7
DEBARMENT AND OTHER SANCTIONS (JAN 1999)

(a) Notwithstanding 5 U.S.C. 8902(j) or any other provision of the law and regulations, if, under 5 U.S.C. 8902a, 5 CFR 970, or Public Law 103-123 (or other applicable appropriations law), a provider is barred from participating in the Program under 5 U.S.C. or the provider's services under 5 U.S.C. are excluded, the Carrier agrees that no payment shall be made by the Carrier pursuant to any contract under 5 U.S.C. (either to such provider or by reimbursement) for any service or supply furnished by such provider during the period of the debarment, except as provided in 5 CFR 970.200(b).

(b) The OPM shall notify the Carrier when a provider is barred from the FEHBP.

SECTION 2.8
FILING HEALTH BENEFIT CLAIMS/COURT REVIEW OF DISPUTED CLAIMS (MAR 1995) (FEHBAR 1652.204-72)

(FFS-2008)

(a) General. (1) The Carrier resolves claims filed under the Plan. All health benefit claims must be submitted initially to the Carrier. If the Carrier denies a claim (or a portion of a claim), the covered individual may ask the Carrier to reconsider its denial. If the Carrier affirms its denial or fails to respond as required by paragraph (b) of this clause, the covered individual may ask OPM to review the claim. A covered individual must exhaust both the Carrier and OPM review processes specified in this clause before seeking judicial review of the denied claim.

(2) This clause applies to covered individuals and to other individuals or entities who are acting on the behalf of a covered individual and who have the covered individual's specific written consent to pursue payment of the disputed claim.

(b) Time limits for reconsidering a claim. (1) The covered individual has 6 months from the date of the notice to the covered individual that a claim (or a portion of a claim) was denied by the Carrier in which to submit a written request for reconsideration to the Carrier. The time limit for requesting reconsideration may be extended when the covered individual shows that he or she was prevented by circumstances beyond his or her control from making the request within the time limit.

(2) The Carrier has 30 days after the date of receipt of a timely-filed request for reconsideration to:

(i) Affirm the denial in writing to the covered individual;

(ii) Pay the bill or provide the service; or

(iii) Request from the covered individual or provider additional information needed to make a decision on the claim. The Carrier must simultaneously notify the covered individual of the information requested if it requests additional information from a provider. The Carrier has 30 days after the date the information is received to affirm the denial in writing to the covered individual or pay the bill or provide the service. The Carrier must make its decision based on the evidence it has if the covered individual or provider does not respond within 60 days after the date of the Carrier's notice requesting additional information. The Carrier must then send written notice to the covered individual of its decision on the claim. The covered individual may request OPM review as provided in paragraph (b)(3) of this clause if the Carrier fails to act within the time limit set forth in this paragraph.

(3) The covered individual may write to OPM and request that OPM review the Carrier's decision if the Carrier either affirms its denial of a claim or fails to respond to a covered individual's written request for reconsideration within the time limit set forth in paragraph (b)(2) of this clause. The covered individual must submit the request for OPM review within the time limit specified in paragraph (e)(1) of this clause.

(4) The Carrier may extend the time limit for a covered individual's submission of additional information to the Carrier when the covered individual shows he or she was not notified of the time limit or was prevented by circumstances beyond his or her control from submitting the additional information.

(c) Information required to process requests for reconsideration. (1) The covered individual must put the request to the Carrier to reconsider a claim in writing and give the reasons, in terms of applicable brochure provisions, that the denied claim should have been approved.

(2) If the Carrier needs additional information from the covered individual to make a decision, it must:

(i) Specifically identify the information needed;

(ii) State the reason the information is required to make a decision on the claim;

(FFS-2008)

(iii) Specify the time limit (60 days after the date of the Carrier's request) for submitting the information; and

(iv) State the consequences of failure to respond within the time limit specified, as set out in paragraph (b)(2) of this section.

(d) Carrier determinations. The Carrier must provide written notice to the covered individual of its determination. If the Carrier affirms the initial denial, the notice must inform the covered individual of:

(1) The specific and detailed reasons for the denial;

(2) The covered individual's right to request a review by OPM; and

(3) The requirement that requests for OPM review must be received within 90 days after the date of the Carrier's denial notice and include a copy of the denial notice as well as documents to support the covered individual's position.

(e) OPM review. (1) If the covered individual seeks further review of the denied claim, the covered individual must make a request to OPM to review the Carrier's decision. Such a request to OPM must be made:

(i) Within 90 days after the date of the Carrier's notice to the covered individual that the denial was affirmed; or

(ii) If the Carrier fails to respond to the covered individual as provided in paragraph (b)(2) of this clause, within 120 days after the date of the covered individual's timely request for reconsideration by the Carrier; or

(iii) Within 120 days after the date the Carrier requests additional information from the covered individual, or the date the covered individual is notified that the Carrier is requesting additional information from a provider. OPM may extend the time limit for a covered individual's request for OPM review when the covered individual shows he or she was not notified of the time limit or was prevented by circumstances beyond his or her control from submitting the request for OPM review within the time limit.

(2) In reviewing a claim denied by the Carrier, OPM may

(i) Request that the covered individual submit additional information;

(ii) Obtain an advisory opinion from an independent physician;

(iii) Obtain any other information as may in its judgment be required to make a determination; or

(iv) Make its decision based solely on the information the covered individual provided with his or her request for review.

(3) When OPM requests information from the Carrier, the Carrier must release the information within 30 days after the date of OPM's written request unless a different time limit is specified by OPM in its request.

(4) Within 90 days after receipt of the request for review, OPM will either:

(i) Give a written notice of its decision to the covered individual and the Carrier; or

(ii) Notify the individual of the status of the review. If OPM does not receive requested evidence within 15 days after expiration of the applicable time limit in paragraph (e)(3) of this clause, OPM may make its decision based solely on information available to it at that time and give a written notice of its decision to the covered individual and to the Carrier.

(f) OPM, upon its own motion, may reopen its review if it receives evidence that was unavailable at the time of its original decision.

(g) Court review. (1) A suit to compel enrollment under § 890.102 of Title 5, Code of Federal Regulations, must be brought against the employing office that made the enrollment decision.

(FFS-2008)

(2) A suit to review the legality of OPM's regulations under this part must be brought against the Office of Personnel Management.

(3) Federal Employees Health Benefits (FEHB) carriers resolve FEHB claims under authority of Federal statute (chapter 89, title 5, United States Code). A covered individual may seek judicial review of OPM's final action on the denial of a health benefits claim. A legal action to review final action by OPM involving such denial of health benefits must be brought against OPM and not against the Carrier or the Carrier's subcontractors. The recovery in such a suit shall be limited to a court order directing OPM to require the Carrier to pay the amount of benefits in dispute.

(4) An action under paragraph (3) of this clause to recover on a claim for health benefits:

(i) May not be brought prior to exhaustion of the administrative remedies provided in paragraphs (a) through (f) of this clause;

(ii) May not be brought later than December 31 of the 3rd year after the year in which the care or service was provided; and

(iii) Will be limited to the record that was before OPM when it rendered its decision affirming the Carrier's denial of benefits.

SECTION 2.9
CLAIMS PROCESSING (JAN 2001)

A standardized claims filing process shall be used by all FEHB carriers. The Carrier shall apply procedures for using the standard claims process. At a minimum the Carrier's program must achieve the following objectives:

(1) The majority of provider claims should be submitted electronically;

(2) All providers shall be notified that future claims must be submitted electronically, or on the Centers for Medicare and Medicaid Services 1500 form or the UB-92 form;

(3) The Carrier shall not use any unique provider claim form(s) for such FEHB member claims;

(4) The Carrier should reject all such claims submitted on forms other than the CMS 1500 form or the UB-92 form and shall explain the reason on the Explanation of Benefits form; and

(5) The Carrier shall advise OPM of its progress in implementing this policy as directed by the Contracting Officer.

SECTION 2.10
CALCULATION OF COST SHARING PROVISIONS (JAN 1996)

When the Member is required to pay a specified percentage of the cost of covered services, the Member's obligation for covered services shall be based on the amount the provider has agreed to accept as full payment, including future discounts that are known and that can be accurately calculated at the time the claim is processed. This includes for example, prompt pay discounts as well as other discounts granted for various business reasons. Any discount not determined at the time of the actual adjudication shall be placed in the Special Reserve upon its determination.

SECTION 2.11
BENEFITS PAYMENTS WHEN MEDICARE IS PRIMARY (JAN 2007)

When a Member who is covered by Medicare Part A, Part B, or Parts A and B on a fee-for-service basis (a) receives services that generally are eligible for coverage by Medicare (regardless of whether or not benefits are paid by Medicare) and are covered by the Carrier, and (b) Medicare is the primary payer and the Carrier is the secondary payer for the Member under the order of benefit determination rules stated in Appendix A and Appendix D of this contract, then the Carrier shall limit its payment to an amount that supplements the benefits payable by Medicare (regardless of whether or not Medicare benefits are paid). For Medicare Part B prescription drugs, the Carrier will coordinate benefits except when prescription drugs are purchased from retail or mail order. When emergency services have been provided by a Medicare nonparticipating institutional provider and the provider is not reimbursed by Medicare, the Carrier shall pay its primary benefits. Payments that supplement Medicare include amounts necessary to reimburse the Member for Medicare deductibles, coinsurance, copayments, and the balance between the Medicare approved amount and the Medicare limiting charge made by non-participating providers.

Carriers may use the Department of Veterans Affairs (VA) Medicare-equivalent remittance advice (MRA) when the form is submitted to determine the Plan's benefits payment for covered services provided to members who have Medicare as their primary payer, when Medicare does not pay the VA facility.

SECTION 2.12
CONTINUING REQUIREMENTS AFTER TERMINATION OF THE CARRIER
(JAN 2004)

(a) The Carrier shall fulfill all of the requirements agreed to under the contract that continue after termination. The order of precedence for the applicable laws, regulations, and the contract are listed in Section 1.3.

(b) Contract requirements extend beyond the date of the Carrier's termination until the effective date of the new enrollment including processing and paying claims incurred prior to the effective date of the new enrollment.

(c) When the prior carrier is discontinued in whole or in part, the gaining carrier assumes full coverage on the effective date of the new enrollment.

SECTION 2.13 LARGE PROVIDER AGREEMENTS (OCT 2005) (FEHBAR 1652.204-74)

(a) <u>Notification and Information Requirements</u>. (1) The experience-rated Carrier must provide notice to the Contracting Officer of its intent to enter into or to make a significant modification of a Large Provider Agreement:

(i) Not less than 60 days before entering into any Large Provider Agreement; and

(ii) Not less than 60 days before exercising a renewal or other option, or significant modification to a Large Provider Agreement, when such action would result in total costs to the FEHB Program of an additional 20 percent or more above the existing contract. However, if a Carrier is exercising a simple renewal or other option contemplated by a Large Provider Agreement that OPM previously reviewed, and there are no significant changes, then a statement to the effect that the renewal or other option is being exercised along with the dollar amount is sufficient notice.

(2) The Carrier's notification to the Contracting Officer must be in writing and must, at a minimum:

(i) Describe the supplies and/or services the proposed provider agreement will require;

(ii) Identify the proposed basis for reimbursement;

(iii) Identify the proposed provider agreement, explain why the Carrier selected the proposed provider, and what contracting method it used, where applicable, including the kind of competition obtained;

(iv) Describe the methodology the Carrier used to compute the provider's profit; and,

(v) Describe provider risk provisions.

(3) The Contracting Officer may request from the Carrier any additional information on a proposed provider agreement and its terms and conditions prior to a provider award and during the performance of the agreement.

(4) Within 30 days of receiving the Carrier's notification, the Contracting Officer will give the Carrier either written comments or written notice that there will be no comments. If the Contracting Officer comments, the Carrier must respond in writing within 10 calendar days, and explain how it intends to address any concerns.

(5) When computing the Carrier's service charge, the Contracting Officer will consider how well the Carrier complies with the provisions of this section, including the advance notification requirements, as an aspect of the Carrier's performance factor.

(6) The Contracting Officer's review of any Large Provider Agreement, option, renewal, or modification will not constitute a determination of the acceptability of the terms and conditions of any provider agreement or of the allowability of any costs under the Carrier's contract, nor will it relieve the Carrier of any responsibility for performing the contract.

(b) Records and Inspection. The Carrier must insert in all Large Provider Agreements the requirement that the provider will retain and make available to the Government all records relating to the agreement that support the annual statement of operations and enrollee records-- Retain for 6 years after the agreement term ends.

(c) Audit and Records - Negotiation. The provisions of FAR 52.215-2, "Audit and Records--Negotiation," when required, or FEHBAR 1652.246-70, "FEHB Inspection" apply to all experience-rated Carriers' Large Provider Agreements. The Carrier will insert the clauses at FAR 52.215-2, when applicable, or FEHBAR 1652.246-70 in all Large Provider Agreements. In FAR 52.215-2 the Carrier will substitute

(1) The term "Large Provider" for the term "Contractor" throughout the clause, and

(2) The term "Large Provider Agreement" for the term "Subcontracts" in paragraph (g) of FAR 52.215-2. The term "Contracting Officer" will mean the FEHB Program Contracting Officer at OPM. The Carrier will be responsible for ensuring the Large Provider complies with the provisions set forth in the clause.

(d) Prohibited Agreements. No provider agreement made under this contract will provide for payment on a cost-plus-a-percentage-of-cost basis.

(e) The Carrier will insert this clause, 1652.204-74, in all Large Provider Agreements.


SECTION 2.14
COORDINATION OF PRESCRIPTION DRUG BENEFITS WITH MEDICARE (JAN 2006)

(a) The Carrier shall comply with the Center for Medicare and Medicaid Services' (CMS) Part D Coordination of Benefits Guidance when the mechanisms and systems indicated in this guidance are in place and functioning properly. This guidance provides the

requirements and procedures for coordination of benefits between Part D plans and other providers of prescription drug coverage.

(b) For Medicare Part B covered prescription drugs, the Carrier will coordinate benefits with Medicare except when such prescription drugs are purchased from retail or mail order pharmacies. The Carrier may pay its benefits on retail pharmacy or mail order drugs eligible for Medicare Part B coverage.

(FFS-2008)

# PART III - PAYMENTS, CHARGES AND ACCOUNTING

## SECTION 3.1
## PAYMENTS—EXPERIENCE-RATED CONTRACTS (JAN 2003) (FEHBAR 1652.232-71)

(a) OPM will pay to the Carrier, in full settlement of its obligations under this contract, subject to adjustment for error or fraud, the subscription charges received for the Plan by the Employees Health Benefits Fund (hereinafter called the Fund) less the amounts set aside by OPM for the Contingency Reserve and for the administrative expenses of OPM and amounts for obligations due pursuant to paragraph (b) of this clause, plus any payments made by OPM from the Contingency Reserve.

(b) OPM will notify the Carrier of amounts due for outstanding obligations under the contract. Not later than 60 days after the date of written notice from OPM, the Carrier shall reimburse OPM. If payment is not received within the prescribed time frame, OPM shall withhold the amount due from the subscription charges owed the Carrier under paragraph (a) of this clause.

(c) The specific subscription rates, charges, allowances and limitations applicable to the contract are set forth in Appendix B.

(d) Recurring payments from premiums shall be made available for carrier drawdown not later than thirty days after receipt by the Fund. The Contracting Officer may authorize special non-recurring payments from the Contingency Reserve in accordance with OPM's regulations.

(e) In the event this contract between the Carrier and OPM is terminated or not renewed in accordance with General Provision 1.15, *Renewal and Withdrawal of Approval*, the Contingency Reserve of the Carrier held by OPM shall be available to the Carrier to pay the necessary and proper charges against this contract to the extent that the Carrier reserves are insufficient for that purpose.


## SECTION 3.2
## ACCOUNTING AND ALLOWABLE COST (JAN 2003) (FEHBAR 1652.216-71)

(a) <u>Annual Accounting Statements</u>.

(1) The Carrier shall furnish to OPM an accounting of its operations under the contract. In preparing the accounting, the Carrier shall follow the reporting requirements and statement formats prescribed by OPM in the OPM Annual and Fiscal Year Financial Reporting Instructions.

(2) The Carrier shall have its Annual Accounting Statements and that of its underwriter, if any, audited in accordance with the FEHBP Experienced-Rated Carrier and Service Organization Audit Guide (Guide). The Carrier shall submit the audit report and the Annual Accounting Statements to OPM in accordance with the requirements of the Guide.

(3) Based on the results of either the independent audit prescribed by the Guide or a Government audit, OPM may require the Carrier to adjust its annual accounting statements (i) by amounts found not to constitute actual, allowable, allocable and reasonable costs; or (ii) to reflect prior overpayments or underpayments.

(4) The Carrier shall develop corrective action plans to resolve audit findings identified in audits that were performed in accordance with the Guide. The corrective action plans will be prepared in accordance with and as defined by the Guide.

(b) <u>Definition of costs</u>. (1) The Carrier may charge a cost to the contract for a contract term if the cost is actual, allowable, allocable, and reasonable. In addition, the Carrier must:

(FFS-2008)

(i) on request, document and make available accounting support for the cost to justify that the cost is actual, reasonable and necessary; and

(ii) determine the cost in accordance with: (A) the terms of this contract, and (B) Subpart 31.2 of the Federal Acquisition Regulation (FAR) and Subpart 1631.2 of the Federal Employees Health Benefits Program Acquisition Regulation (FEHBAR) applicable on the first day of the contract period.

(2) In the absence of specific contract terms to the contrary, the Carrier shall classify contract costs in accordance with the following criteria:

(i) <u>Benefits</u>. Benefit costs consist of payments made and liabilities incurred for covered health care services on behalf of FEHBP subscribers less any refunds, rebates, allowances or other credits received.

(ii) <u>Administrative expenses</u>. Administrative expenses consist of all actual, allowable, allocable and reasonable expenses incurred in the adjudication of subscriber benefit claims or incurred in the Carrier's overall operation of the business. Unless otherwise stated in the contract, administrative expenses include, in part: all taxes (excluding premium taxes, as provided in section 1631.205-41), insurance and reinsurance premiums, medical and dental consultants used in the adjudication process, concurrent or managed care review when not billed by a health care provider and other forms of utilization review, the cost of maintaining eligibility files, legal expenses incurred in the litigation of benefit payments and bank charges for letters of credit. Administrative expenses exclude the cost of Carrier personnel, equipment, and facilities directly used in the delivery of health care services, which are benefit costs, and the expense of managing the FEHBP investment program which is a reduction of investment income earned.

(iii) <u>Investment income</u>. While compliance with the checks presented letter of credit methodology will minimize funds on hand, the Carrier shall invest and reinvest all funds on hand, including any in the Special Reserve or any attributable to the reserve for incurred but unpaid claims, which are in excess of the funds needed to discharge promptly the obligations incurred under the contract. Investment income represents the net amount earned by the Carrier after deducting investment expenses. Investment expenses are those actual, allowable, allocable, and reasonable contract costs that are attributable to the investment of funds, such as consultant or management fees.

(iv) <u>Other charges</u>. (A) <u>Mandatory statutory reserve</u>. Charges for mandatory statutory reserves are not allowable unless specifically provided for in the contract. When the term "mandatory statutory reserve" is specifically identified as an allowable contract charge without further definition or explanation, it means a requirement imposed by State law upon the Carrier to set aside a specific amount or rate of funds into a restricted reserve that is accounted for separately from all other reserves and surpluses of the Carrier and which may be used only with the specific approval of the State official designated by law to make such approvals. The amount chargeable to the contract may not exceed an allocable portion of the amount actually set aside. If the statutory reserve is no longer required for the purpose for which it was created, and these funds become available for the general use of the Carrier, the Carrier shall return to the FEHBP a pro rata share based upon FEHBP's contribution to the total Carrier's set aside shall be returned to the FEHBP in accordance with FAR 31.201-5.

(B) <u>Premium taxes</u>. (1) When the term "premium taxes" is used in this contract without further definition or explanation, it means a tax, fee, or other monetary payment directly or indirectly imposed on FEHB premiums by any State, the District of Columbia, or the Commonwealth of Puerto Rico or by any political subdivision or other governmental authority of

those entities, with the sole exception of a tax on net income or profit, if that tax, fee, or payment is applicable to a broad range of business activity.

(2) For purposes of this paragraph (B), OPM has determined that the term "State" as used in 5 U.S.C. 8909(f) includes, but is not limited to, a territory or possession of the United States.

(c) Certification of Accounting Statement Accuracy. (1) The Carrier shall certify the annual and fiscal year accounting statements in the form set forth in paragraph (c)(3) of this clause. The Carrier's chief executive officer and the chief financial officer shall sign the certificate.

(2) The Carrier shall require an authorized agent of its underwriter, if any, also to certify the annual accounting statement.

(3) The certificate required shall be in the following form:

## CERTIFICATION OF ACCOUNTING
## STATEMENT ACCURACY

This is to certify that I have reviewed this accounting statement and to the best of my knowledge and belief:

1. The statement was prepared in conformity with the guidelines issued by the Office of Personnel Management and fairly presents the financial results of this reporting period in conformity with those guidelines.

2. The costs included in the statement are actual, allowable, allocable, and reasonable in accordance with the terms of the contract and with the cost principles of the Federal Employees Health Benefits Acquisition Regulation and the Federal Acquisition Regulation;

3. Income, rebates, allowances, refunds and other credits made or owed in accordance with the terms of the contract and applicable cost principles have been included in the statement;

4. If applicable, the letter of credit account was managed in accordance with 5 CFR part 890, 48 CFR chapter 16, and OPM guidelines.

Carrier Name: _____

Name of Chief Executive Officer:
(Type or Print)

_____

Name of Chief Financial Officer:

_____

Signature of Chief Executive Officer:

_____

Signature of Chief Financial Officer:

_____

Date Signed:

_____

Date Signed: _____
Underwriter:

_____

Name and Title of Responsible Corporate Official:
(Type or Print:)

_____

Signature of Responsible Corporate Official:

_____

Date Signed:_____

(FFS-2008)

(End of Certificate)

SECTION 3.3
SPECIAL RESERVE (JAN 2003)

(a) This contract is experience rated. The Special Reserve represents the cumulative difference between income to the plan (subscription income plus interest on investments [item (b)(2)(iii) in Section 3.2, *Accounting and Allowable Cost*, which also includes income gain or loss]) and plan expenses (benefit costs plus allowable administrative expenses and retentions). The Special Reserve held by or on behalf of the Carrier is to be used only for payment of charges against this contract.

(b) If this contract is terminated or not renewed and there is a positive balance remaining in the Special Reserve after all allowable costs chargeable to the contract in accordance with Section 3.2 plus an agreed-upon amount of administrative expenses for contract liquidation have been paid, the balance of any funds held by the Carrier, including current income on its investment, shall be paid to OPM for credit to the Carrier's Contingency Reserve maintained by OPM when the Carrier submits its annual accounting statement for the final contract year.

(c) The Carrier shall incorporate this clause in all agreements with underwriters of the Carrier's FEHB Plan.

SECTION 3.4
INVESTMENT INCOME (JAN 1998) (FEHBAR 1652.215-71)

(a) The Carrier shall invest and reinvest all FEHB funds on hand that are in excess of the funds needed to promptly discharge the obligations incurred under this contract. The Carrier shall seek to maximize investment income with prudent consideration to the safety and liquidity of investments.

(b) All investment income earned on FEHB funds shall be credited to the Special Reserve on behalf of the FEHBP.

(c) When the Contracting Officer concludes that the Carrier failed to comply with paragraphs (a) or (b) of this clause, the Carrier shall credit the Special Reserve with investment income that would have been earned, at the rate(s) specified in paragraph (f) of this clause, had it not been for the Carrier's noncompliance. "Failed to comply with paragraphs (a) or (b)" means: (1) making any charges against the contract which are not allowable, allocable, or reasonable; or (2) failing to credit any income due the contract and/or failing to place excess funds, including subscription income and payments from OPM not needed to discharge promptly the obligations incurred under the contract, refunds, credits, payments, deposits, investment income earned, uncashed checks, or other amounts owed the Special Reserve, in income producing investments and accounts.

(d) Investment income lost as a result of unallowable, unallocable, or unreasonable charges against the contract shall be paid from the first day of the contract term following the contract term in which the unallowable charge was made and shall end on the earlier of: (1) the date the amounts are returned to the Special Reserve (or the Office of Personnel Management); (2) the date specified by the Contracting Officer; or (3) the date of the Contracting Officer's Final Decision.

(e) Investment income lost as a result of failure to credit income due the contract or failure to place excess funds in income producing investments and accounts shall be paid from the date the

(FFS-2008)

funds should have been invested or appropriate income was not credited and shall end on the earlier of: (1) the date the amounts are returned to the Special Reserve (or the Office of Personnel Management); (2) the date specified by the Contracting Officer; or (3) the date of the Contracting Officer's Final Decision.

(f) The Carrier shall credit the Special Reserve for income due in accordance with this clause. All lost investment income payable shall bear simple interest at the quarterly rate determined by the Secretary of the Treasury under the authority of 26 U.S.C. 6621(a)(2) applicable to the periods in which the amount becomes due, as provided in paragraphs (d) and (e) of this clause.

(g) The Carrier shall incorporate this clause into agreements with underwriters of the Carrier's FEHB plan and shall substitute "underwriter" or other appropriate reference for the term "Carrier".

SECTION 3.5
NON-COMMINGLING OF FUNDS (JAN 1991) (FEHBAR 1652.232-72)

(a) The Carrier and/or its underwriter shall keep all FEHBP funds for this contract (cash and investments) physically separate from funds obtained from other sources. Accounting for such FEHBP funds shall not be based on allocations or other sharing mechanisms and shall agree with the Carrier's accounting records.

(b) In certain instances the physical separation of FEHBP funds may not be practical or desirable. In such cases, the Carrier may request a waiver from this requirement from the Contracting Officer. The waiver shall be requested in advance and the Carrier shall demonstrate that accounting techniques have been established that will clearly measure FEHBP cash and investment income (*i.e.*, subsidiary ledgers). Reconciliations between amounts reported and actual amounts shown in accounting records shall be provided as supporting schedules to the Annual Accounting Statements.

(c) The Carrier shall incorporate this clause in all subcontracts that exceed $25,000 and shall substitute "contractor" or other appropriate reference for "Carrier and/or its underwriter".

SECTION 3.6
UNCASHED CHECKS (JAN 1996)

Payment of checks issued pursuant to this contract shall be voided if the checks have been outstanding for two (2) years. The amounts represented by these checks shall be credited to the Special Reserve of this contract no later than the 25th month after issuance. The term "Check" shall include any written instrument issued to pay or reimburse the payment of benefits, or any services, supplies or subcontracts hereunder.

SECTION 3.7
SERVICE CHARGE (JAN 1996)

(a) Any service charge negotiated shall be set forth in Appendix B and shall be the total profit that can be charged to the contract. The amount set forth in Appendix B shall encompass all profit (whether entitled service charge, profit, fee, contribution to reserves or surpluses or any other title) that may be included in major subcontracts in accordance with the provisions of FEHBAR 1631.205-80, Major Subcontractor Service Charges.

(b) One-twelfth of the service charge for the contract term accrues on the last day of each month during the contract term. The Carrier shall withdraw the service charge from the Special Reserve when it accrues.

(c) If this contract is renewed by operation of section 1.15(a), the amount of the service charge accrued under (b) shall be "one-twenty-fourth" rather than "one-twelfth." The remainder of the service charge not otherwise accrued during the contract term shall accrue on the last day of the contract term.

SECTION 3.8
CONTRACTOR RECORDS RETENTION (JUL 2005) (FEHBAR 1652.204-70)

Notwithstanding the provisions of Section 5.7 (FAR 52.215-2(f)), *Audit and Records - Negotiation* the Carrier will retain and make available all records applicable to a contract term that support the annual statement of operations and, for contracts that equal or exceed the threshold at FAR 15.403-4(a)(1), the rate submission for that contract term for a period of six years after the end of the contract term to which the records relate. This includes all records of Large Provider Agreements and subcontracts that equal or exceed the threshold requirements. In addition, individual enrollee and/or patient claim records will be maintained for six years after the end of the contract term to which the claim records relate. This clause is effective prospectively as of the 2005 contract year.

SECTION 3.9
APPROVAL FOR ASSIGNMENT OF CLAIMS (JAN 1991) (FEHBAR 1652.232-73)

(a) Notwithstanding the provisions of Section 5.35 [FAR 52.232-23], *Assignment of Claims*, the Carrier shall not make any assignment under the Assignment of Claims Act without the prior written approval of the Contracting Officer.

(b) Unless a different period is specified in the Contracting Officer's written approval, an assignment shall be in force only for a period of one year from the date of the Contracting Officer's approval. However, assignments may be renewed upon their expiration.

SECTION 3.10
AUDIT, FINANCIAL, AND OTHER INFORMATION (JAN 2001)

The Carrier shall furnish to OPM audit, financial, and other information in the format and within the time frames specified in the Audit Guide for Financial Statement Audits, Reporting on Internal Controls and Compliance with Laws and Regulations, Attestation Reports, Agreed-Upon Procedures, and Reporting on Internal Controls of Third Party Servicing Organizations. Information and reports shall be furnished in the required number of copies to the addresses specified by OPM.

SECTION 3.11
SURVEY CHARGES (JAN 2002)

(a) If the Carrier participates in an FEHB annual consumer assessment survey, it shall pay OPM's contractor a pro rata share of the total cost of consolidating and reporting the survey

results to OPM. The Carrier shall pay a separate fee for each plan option and /or rating area. The Carrier agrees to pay the contractor's invoice within 30 days of the billing date. If the Carrier does not remit payment to the contractor within 60 days of the billing date, OPM shall withhold the amount due from the Carrier's subscription charges according to FEHBAR 1652.232-71, Payments–experience-rated contracts, and forward payment to the contractor.

(b) Costs incurred by the Carrier for contracting with a vendor to conduct the survey shall be the Carrier's responsibility and constitute allowable administrative charges.

## SECTION 3.12
## FEHB CLEARINGHOUSE (JAN 2002)

(a) The FEHB Clearinghouse will facilitate the reconciliation of enrollments between carriers and Federal agencies. The Carrier shall pay a pro rata share based on its proportion of FEHB premiums as determined by OPM for the cost of developing and operating the Clearinghouse.

(b) OPM shall withhold the amount due from the Carrier's subscription charges under the authority of FEHBAR 1652.232-71, Payments--Experience-Rated Contracts, and shall forward payment to the FEHB Clearinghouse.

## SECTION 3.13
## TAXPAYER IDENTIFICATION NUMBER (JAN 2000) (FEHBAR 1652.204-73)

*(a)   Definitions.*

*Common parent,* as used in this provision, means that corporate entity that owns or controls an affiliated group of corporations that files its Federal income tax returns on a consolidated basis, and of which the Carrier is a member.

*Taxpayer Identification Number (TIN),* as used in this provision, means the number required by the Internal Revenue Service (IRS) to be used by the Carrier in reporting income tax and other returns.

(b) The Carrier must submit the information required in paragraphs (d) through (f) of this clause to comply with debt collection requirements of 31 U.S.C. 7701(c) and 3325(d), reporting requirements of 26 U.S.C. 6041, 6041A, and 6050M, and implementing regulations issued by the IRS. The Carrier is subject to the payment reporting requirements described in Federal Acquisition Regulation (FAR) 4.904. The Carrier's failure or refusal to furnish the information will result in payment being withheld until the TIN number is provided.

(c) The Government may use the TIN to collect and report on any delinquent amounts arising out of the Carrier's relationship with the Government (31 U.S.C. 7701(c)(3)). The TIN provided hereunder may be matched with IRS records to verify its accuracy.

(d)   Taxpayer Identification Number (TIN*).*
TIN: _____
(e) Type of organization.
☐     Sole proprietorship;
☐     Partnership;
☐     Corporate entity (not tax-exempt);
☐     Corporate entity (tax-exempt);
☐     Other_____.
(f) Common parent.

(FFS-2008)

☐     Carrier is not owned or controlled by a common parent as defined in paragraph (a) of this clause.

☐     Name and TIN of common parent:

Name_____

TIN_____

(FFS-2008)